**FORD v. C. E. WILSON & CO., INC., et al.**
**No. 49.**

Circuit Court of Appeals, Second Circuit.
July 8, 1942.

See, also, D.C. 30 F.Supp. 163.

Raymond R. Bowers, of South Manchester, Conn., (Day, Berry & Howard, Cyril Coleman, and Charles S. House, all of Hartford, Conn., of counsel), for appellant.

B. A. Brickley and Herrick, Smith, Donald & Farley, all of Boston, Mass. (O. A. Schlaikjer and F. C. Underhay, both of Boston, Mass., of counsel), for appellee Federal Reserve Bank of Boston.

Before SWAN, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The plaintiff individually and certain assignors whom he represents sold roses to the defendant C. E. Wilson & Company, Inc., under contracts made in 1937 and, prior to January 24, 1938, shipped them from Texas to Manchester, Connecticut, by rail. Some of the shipments arrived at their destination and title to all of them had passed to Wilson prior to January 24, 1938. Wilson was previously indebted to the Federal Reserve Bank of Boston (herein called the Bank) in the sum of $75,000 but was in need of additional funds to conduct its business. That business consisted of the sale of nursery stock of which a very large part was the sale of rose bushes which it purchased and processed for the market. The above mentioned indebtedness to the Bank was to the extent of $50,000 secured by a chattel mortgage dated December 16, 1935, covering Wilson's nursery stock and equipment and also by an agreement which, if the Bank required, would cover notes and accounts receivable. On or about January 17, 1938, Wilson gave the bank a detailed financial statement in connection with an application for an additional loan of $6500 to meet its need of working capital. This statement indicated solvency and showed that Wilson then had $121,000 over debts. The requested advance of $6500 was made by the Bank on January 24, 1938. At the same time Wilson gave the Bank a lease of the basement and a room on the main floor of its warehouse in Manchester, Connecticut, at a nominal rental and also agreements pledging all the equipment, nursery stock and chattels then owned or thereafter to be acquired, and assigning both present and future accounts receivable as security for all the advances to it by the Bank which aggregated $81,500 and were to mature at various dates up to June 1, 1938. Likewise as a condition of obtaining the final advance of $6500 Wilson arranged with the Bank to have the latter's agent McKelvie take possession of the leased space in its warehouse and of all the pledged properties and to have the proceeds of all accounts receivable deposited in a special account to be set up by Wilson in the Hartford-Connecticut Trust Company. McKelvie from time to time released mortgaged and pledged nursery stock for processing and sale and received assignments to the Bank of accounts derived from such sales. The proceeds when received were deposited in the special account but were to some extent released by McKelvie to enable Wilson to meet payrolls and pay certain pressing bills. The countersignature of McKelvie was required for any payments by Wilson from the special account in order to have the checks honored by the Trust Company. Such checks as were countersigned by McKelvie for this purpose were deposited in Wilson's general account on which the latter drew to make payments to meet its payrolls and urgent bills.

The plaintiff and his assignors were rose growers in Texas who during the summer and autumn of 1937 had contracted with Wilson for the delivery of approximately 200,000 rose bushes in Manchester, Connecticut, and Jacksonville, Texas, for an agreed price of about $16,500. Delivery of the rose bushes was to be made in January, 1938, but

payment was not due until June 1, 1938. All of the rose bushes were shipped from Texas on or prior to January 20, 1938, and arrived in Manchester and Jacksonville at various dates in January, 1938. The Bank advanced the $6500 after receiving the financial statement we have referred to and after being informed by Wilson in September, 1937, that a $150,000 business for the next year was anticipated, which would have yielded a fair profit. But in the early months of 1938, when the season was ordinarily at the peak, business failed to come up to expectations and as a result, after June 1, 1938, the Bank applied upon its own loans the proceeds of such accounts as it was able to collect under the assignments which it held and also foreclosed its chattel mortgage on Wilson's equipment which it bid in at $10,000. The accounts assigned to Wilson during the four months succeeding the loan of $6500 aggregated $87,788.58 and during this period the Bank collected $57,-551.97 of which it released $41,391.66 to pay Wilson's pressing obligations. Thereafter it further liquidated the accounts held as collateral. By December 20, 1938, when this suit was filed, it had collected $75,664.-03 of which it had released $54,255.68 thereof to Wilson in order to meet payroll and other urgent obligations and had applied $21,408.35 upon its own loans. After applying this portion of the collections and the $10,000 realized from the foreclosure, there remained a balance due the Bank of about $60,000 upon its advances of $81,500. The rose bushes were processed by Wilson and sold to the trade for about $31,500, but nothing was paid on the claims of the Texas rose growers. The plaintiff, as representative of the latter, recovered a judgment against Wilson for $17,327.66, the amount of the purchase price that remained unpaid.

This action was brought to recover from both Wilson and the Bank. The complaint contained two counts. The first count was based on the claim that the Bank had unlawfully induced Wilson to break the contracts it had made with those who sold the roses by persuading it to pledge the roses and assign the accounts to the Bank, thus rendering payment by Wilson therefor impossible. The second count was based on the claim that Wilson and the Bank fraudulently concealed the existence of the pledges, assignments and lease from those who had sold the roses as well as from its other creditors and that the Bank advanced the final loan of $6500 to enable Wilson to continue in business until the period of four months after the transfers were made should expire and it was too late for a trustee in bankruptcy to attack them as unlawful preferences. It was also alleged that they had fraudulently made it appear that Wilson was a solvent going concern, by operating the business in the name of Wilson when the latter's property had been in fact appropriated by the Bank.

The trial court directed a verdict for the defendant-bank on both causes of action as a result of which judgment was entered in favor of the Bank. The plaintiff appeals from the judgment and seeks a reversal on the following five grounds:

▮ The first contention is that the Bank obtained the pledges and assignments of accounts upon the promise that it would pay Wilson's debts and that the plaintiff thus became a third-party beneficiary who was entitled to recovery in this action. It might perhaps be a sufficient answer that no such claim was presented in the pleadings or suggested at the trial. Virginian Ry. v. Mullens, 271 U.S. 220, 227, 228, 46 S.Ct. 526, 70 L.Ed. 915; Hormel v. Helvering, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037. However that may be, there is nothing in the record to support such a claim on the merits. In the first place such a promise seems entirely incredible. The worse off Wilson's financial condition may have appeared to be the more fantastic would be a promise by a creditor, holding all its available assets as security, to pay its debts. In addition to this, it is not claimed that the representative of the Bank promised it would pay for the rose bushes. Hewitt Wilson testified that the assistant cashier of the Bank said to him: " 'When bills come due, present the bills to Mr. McKelvie and he will pay them.' Of course, that could include the rose bushes or it could not. We didn't know what it included." Furthermore, the authority of the Bank's agent McKelvie for the release of collateral was evidenced by a written document, a copy of which was furnished to Wilson. This document read thus:

"Until otherwise instructed in this respect you may from time to time release to the Borrower from the said special account such amounts of cash therein as may be required to meet current payrolls of the Borrower, to pay necessary expenses of processing or otherwise preparing for sale articles of personal property mortgaged or pledged by the

Borrower to the Reserve Bank and to meet such other operating expenses payment of which may become urgent in order to protect the interests of the Reserve Bank in any security for the payment of amounts owing to the Reserve Bank by the Borrower."

In view of the foregoing the claim that some general talk by an assistant cashier to the effect that McKelvie would pay bills presented to him amounted to a promise by the Bank to pay for the rose bushes can have no legal basis.

■ The second contention is that the Bank became liable for interference with the plaintiff's contract rights. This was the basis of the first count of the complaint and amounts to a claim that a creditor who takes security under circumstances rendering payment of the claims of other creditors unlikely is liable in tort. The well settled rule is quite to the contrary. Sweeney v. Smith, C.C., 167 F. 385, affirmed 3 Cir., 171 F. 645, certiorari denied 215 U.S. 600, 30 S.Ct. 400, 54 L.Ed. 343; Lamport v. 4175 Broadway, Inc., D.C., 6 F.Supp. 923, 924; Restatement Torts, § 766, comment i. Such a cause of action certainly must fail where, as here, the Bank obtained its security for a valuable consideration and the preference it received cannot be successfully attacked. The further contention that the Bank interfered with an expectancy of the plaintiff to have the sales of roses changed to a consignment is open to a similar objection. The Bank did not prevent such a change. It merely refused to advance the $6500 unless it should obtain the rose bushes and other collateral as security. Wilson could accept the offer or leave it. Furthermore, title to the rose bushes had passed before the advance was made and the security was taken. Even if Wilson had then been insolvent it could not revest the title and take a consignment without giving away its assets and thus defrauding its creditors. While the court below said in a dictum that it thought the transfer of January 24 constituted a preference we find no evidence that the Bank knew that Wilson was insolvent and its financial statement, its recent prophesy of a profitable business and its request for only a small additional loan indicated the contrary. In addition to all this the Bank had a privilege to interfere with the plaintiff's contracts and expectancies because it was "acting under an equal or a superior right" when seeking security for its own advances.

R an W Hat Shop, Inc., v. Sculley, 98 Conn. 1, 118 A. 55, 59, 29 A.L.R. 551; Knapp v. Penfield, 143 Misc. 132, 256 N.Y.S. 41; Braden v. Perkins, 174 Misc. 885, 22 N.Y.S. 2d 144.

■ The third contention is that the Bank became liable for the plaintiff's contracts because it assumed such control of Wilson's business as to become a co-principal or partner. But it did not control the business of its debtor which the latter continued to conduct. It merely installed an agent in a part of Wilson's premises to protect its security. This was necessary under the rule of Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, in order to insure preservation of its lien. Lindsay v. Rickenbacker, 5 Cir., 116 F.2d 29. What was done here was entirely insufficient to render the Bank a co-principal or partner. In re Prima Co., 7 Cir., 98 F.2d 952.

■ The fourth contention is that the Bank committed a fraud upon the plaintiff by causing Wilson to receive and retain the roses intending that they should not be paid for and by concealing this intention. We find no basis for such a conclusion. It must rest on the theory that when the Bank made its agreement on January 24, 1938, to take the roses as security it knew they could not be paid for. But whatever the knowledge or intention of Wilson may have been at that time there was no adequate proof that the Bank made its loan under circumstances indicating insolvency. When the agreement was made title to the rose bushes had already passed from the growers to Wilson and we cannot say that the Bank then had reasonable cause to believe that they could not be paid for. Even if it were shown that when it made the loan the Bank did have cause to believe this, there is no proof that Wilson had an intention not to pay for the roses when the contracts to purchase them were made and the date when such an intention would render the transaction voidable for fraud was when Wilson contracted to buy them. Strickland v. Willis, Tex.Civ. App., 43 S.W. 602; In re Levi & Picard, D.C., 148 F. 654; Starr v. Stevenson, 91 Iowa 684, 60 N.W. 217; Burrill v. Stevens, 73 Me. 395, 40 Am.Rep. 366; Skinner v. Michigan Hoop Co., 119 Mich. 467, 78 N.W. 547, 75 Am.St.Rep. 413; Restatement Torts § 530.

■ The fifth contention is that the pledges and assignments of accounts were fraudulent transfers and that the Bank par-

618

ticipated in them. The theory seems to be that the Bank concealed its preferential position from the creditors. The chattel mortgage was filed pursuant to law. The pledged merchandise was held by the Bank and segregated by means of its agent McKelvie who occupied the place where it was stored under a lease. This occupancy was known to the secretary of W. G. Glenney Company, who furnished fuel oil and supplies to Wilson. There was no requirement that the Bank should notify the creditors that it held assignments of accounts receivable. The failure to notify them or even the desire not to have the assignments known was not a fraud when unaccompanied by any representation to the creditors that it did not hold the security. There was no proof that the Bank advanced the $6500 for the purpose of getting the rose growers to sell their merchandise for the better securing of the Bank loans. The title to the roses had already passed to Wilson when the advance was made. Nor was there any proof that the advance was made for the purpose of keeping the business alive until the right of creditors to attack its liens had expired through the running of the four months statute.

In view of the foregoing the judgment is affirmed.