NATIONAL WESTMINSTER
BANK USA, Plaintiff,

v.

CENTURY HEALTHCARE CORPORA-TION, Century Healthcare of Arizona, Inc., Century Healthcare of California, Inc., Century Healthcare of Colorado, Inc., Century Healthcare Development Corporation, Century Healthcare of Missouri, Inc., Century Healthcare of Texas, Inc., and Dillon Family and Youth Services, Inc., Defendants.

No. 94 Civ. 3600 (MP).

United States District Court,
S.D. New York.

May 9, 1995.

Brian M. Cogan, Stroock & Stroock & Lavan, New York City, for plaintiff/counter-defendant.

Stephen E. Powers, Ober Kaler Grimes & Shriver, New York City, for defendants/counterclaimants.

## DECISION

MILTON POLLACK, Senior District Judge.

### OPINION and FINDINGS (in part)

NatWest loaned Century approximately $30 Million. The loans are in default. Century seeks to avoid repayment of and to invalidate the loan on a claim of lender liability by reason of alleged domination and control exercised by the bank over the debtor

during the course of the loans, making it "a mere instrumentality" of the lender.

■ A lender is not obligated to sit idly by and watch its financial security erode. The issue is whether a creditor may monitor the debtor's financial situation, make suggestions intended to improve it and take actions short of undue entanglement with the borrower's operations. There is nothing inherently wrong with a creditor carefully monitoring its debtor's financial situation or suggesting courses of action the debtor ought to follow to improve its financial situation.

The Fifth Circuit, in sustaining a directed verdict in favor of a lender, stated the standard as follows:

> An examination of the "instrumentality" cases involving creditor-debtor relationships demonstrates that courts require a strong showing that the creditor assumed actual, participatory, total control of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control, as used in the "instrumentality" doctrine, by the creditor corporation.

*Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.,* 483 F.2d 1098, 1105 (5th Cir.1973), *reh'g denied,* 490 F.2d 916 (5th Cir.1974).

■ Lender liability is predicated on an unmistakable showing that the subservient corporation in reality has no separate, independent existence of its own and was being used to further the purposes of the dominant corporation. Suggestions by a major lender for a defaulted debtor, even when coupled with a threat of the exercise of its legal rights if the debtor does not comply, are both commonplace and completely proper. *See In re Prima Co.,* 98 F.2d 952, 965 (7th Cir.1938), *cert. denied,* 305 U.S. 658, 59 S.Ct. 358, 83 L.Ed. 426 (1939) ("No doubt the debtor, because of its inability to meet its maturing obligations, acquiesced in Harris' recommendations [to install new management], but this we think is not sufficient to constitute domination of its will."). There is nothing inherently wrong with suggesting what course the debtor ought to follow. Unless the creditor has become, in effect, the alter ego of the debtor, he will not be held to an ethical duty in excess of the morals of the market place. *In re Teltronics Services, Inc.,* 29 B.R. 139, 171 (Bankr.E.D.N.Y.1983).

The conduct of plaintiff constituted no more than an assertion of its bargained-for rights. Even when accompanied with threats by a party to act in accordance with its legal rights that does not and cannot constitute duress. *Teachers Ins. and Annuity Ass'n of America v. Wometco Enterprises, Inc.,* 833 F.Supp. 344, 348 (S.D.N.Y.1993) (Sprizzo, J.).

No credible evidence of domination or of duress on the part of the lender was adduced. Moreover, Century has run its business for nearly two years since it agreed to the restructuring of its debt with NatWest. Its delay in raising a claim of duress while its principal stockholder, Mr. Dillon, obtained millions of dollars in cash and value pursuant to that restructuring additionally negates any notion of improper control and disposes of the attempt now to void the debt on a complaint of duress by the lender which is no longer cognizable. Plainly any such claim, if it ever existed, has been waived. *Idem.* at 348–49.

Having heard and seen the witnesses, the issues of credibility are resolved in favor of the plaintiff and against the defendants. The affirmative proof from the witnesses, the corroborating circumstances and the probabilities on which to draw the reasonable inferences on the claims and counterclaims favor the plaintiff and surmount the pallid semantic and almost ludicrous denials and contrived explanations of the defendants' witnesses.

### ADDITIONAL FINDINGS OF FACT

1. Plaintiff NatWest is a national banking association having its principal place of business at 175 Water Street, New York, New York.

2. Defendant Century is an Oklahoma corporation with its principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

3. Defendant Century Healthcare of Arizona, Inc. is an Arizona corporation with its

principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

4. Defendant Century Healthcare of California, Inc. is a California corporation with its principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

5. Defendant Century Healthcare of Colorado, Inc. is a Colorado corporation with its principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

6. Defendant Century Healthcare Development Corporation is an Oklahoma corporation with its principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

7. Defendant Century Healthcare of Missouri, Inc. is a Missouri corporation with its principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

8. Defendant Century Healthcare of Texas, Inc. is a Texas corporation with its principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

9. Defendant Dillon Family and Youth Services, Inc. is an Oklahoma corporation with its principal place of business at 5555 East 71st Street, Suite 9100, Tulsa, Oklahoma.

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $50,000 and is between citizens of different states. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

11. On June 24, 1992, Century and NatWest executed an Amended and Restated Loan Agreement (as subsequently amended, the "Loan Agreement") (PX–2) which consolidated and restated various outstanding loans, evidenced by three separate notes, that NatWest made to Century under an Original Loan Agreement, dated February 12, 1988 (PX–1). Pursuant to the Loan Agreement, Century borrowed $25,860,250 from NatWest (the "Loan"), which was evidenced by the Note, dated June 24, 1992 (the "Note") (PX–4). In addition, NatWest and Defendants executed an Interest Rate Protection Agreement, dated July 26, 1989 (PX–13, 14, 45).

12. Also on June 24, 1992, the remaining defendants (collectively, the "Guarantors") executed the Guarantees in favor of NatWest, absolutely guaranteeing the payment to NatWest of all amounts owed to NatWest by Century. (PX–5, 6, 7, 8, 9, 10, 11).

13. The Guarantors are not parties to the Loan Agreement or the Note.

14. Century was required, pursuant to § 2.4 of the Loan Agreement, to pay to NatWest the principal amount of the Loan in one hundred and fourteen (114) consecutive monthly installments commencing on December 1, 1992, and continuing on each monthly payment date thereafter until payment in full of the Loan on May 1, 2002. Beginning December 1, 1992 through and including January 1, 1994, each installment payment, in the principal amount of $83,333.00, was to be paid on the first day of each calendar month. Thereafter, beginning February 1, 1994 through and including May 1, 2002, each installment payment, in the principal amount of $234,817.13, was also to be paid on the first day of each calendar month. The Loan Agreement further required Century to pay interest in monthly arrears on the first day of each calendar month.

15. On December 1, 1993, Century failed to make an interest installment payment of $140,817.90 as required by the Loan Agreement and thus defaulted under the terms of the Note and the Loan Agreement. Subsequently, on February 1, 1994, Century failed to make a $234,917.13 installment payment as required by the Loan Agreement thus causing a further default under the terms of the Note and the Loan Agreement.

16. Pursuant to § 8.1 of the Loan Agreement, an event of default occurs upon the "failure to make any payment or mandatory prepayment of principal or interest upon the Note when due...."

17. Pursuant to Article 8 of the Loan Agreement, upon the occurrence of the event of default, the entire unpaid balance of principal of and interest on the Note and all other obligations and indebtedness of Century to NatWest arising under the Loan Agreement and other loan documents shall immediately become due and payable upon

written notice to that effect given to Century by NatWest, without presentment or demand for payment, notice of non-payment, protest or further notice or demand of any kind, all of which Century expressly waived.

18. Pursuant to § 9.1(b) of the Loan Agreement, Century promised to pay Nat-West "all costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) suffered or incurred by [NatWest] in connection with its enforcement of the payment of the Note or any other sum due to it under this Agreement or any of the other Loan Documents or any of its other rights hereunder or thereunder."

19. By letter dated April 1, 1994, Nat-West gave written notice to Century of its default under the Loan Agreement and accelerated payment on the Note, declaring due the aggregate amount of $27,030,970.37, plus accrued and unpaid interest, fees, costs and expenses. (PX–12). The letter stated that, until payment in full had been received by NatWest, interest would continue to accrue at the default rate of interest, determined in accordance with the Loan Agreement, on Century's obligation, pursuant to § 2.5(b) of the Loan Agreement. (PX–12).

20. By letters dated April 1, 1994, Nat-West demanded that the Guarantors pay immediately the outstanding amounts of principal and accrued and unpaid interest on the Note. (PX–12).

21. Century has not paid the amounts due under the Loan or the Note. None of the Guarantors have made payment of any of the amounts of principal or accrued interest outstanding on the Loan or the Note.

22. The Note provides, in part, that "The Borrower shall pay costs and expenses of collection, including, without limitation, attorneys' fees and disbursements in the event that any action, suit or proceeding is brought by the holder hereof to collect this Note." (PX–4).

23. A portion of § 9.1(b) of the Loan Agreement provides that Century is to pay NatWest "all costs and expenses (including, without limitation, reasonable fees and disbursements of counsel) suffered or incurred by [NatWest] in connection with its enforce-ment of the payment of the Note or any other sum due to it under this Agreement or any of the other Loan Documents or any of its other rights hereunder or thereunder."

24. Defendants have failed to pay the amounts required to be paid by them under the Loan Documents and the Interest Rate Protection Agreement.

25. The amount of $29,885,054.40, including interest through May 8, 1995, is due under the Loan Documents and the Interest Rate Protection Agreement, plus interest from May 9, 1995, at the post-default rate of interest specified by the Loan Documents, through and including the date of collection.

26. NatWest has incurred the amount of $118,243.09 to March 31, 1995 in connection with its enforcement of the payment of the Note, which constitutes reasonable attorney's fees and costs.

27. NatWest did not interfere improperly in the operations of Century's business. NatWest made a number of suggestions in an effort to protect its $25 million loan, but most of those were considered but rejected by Century.

28. Employees of NatWest never attended a meeting of any of the board of directors of Century.

No employees of NatWest ever served as an employee, director or officer of Century.

29. No employees of NatWest ever served as an employee, director or officer of Century.

30. On several occasions from 1989–1994, NatWest delivered waivers of Century's defaults on the financial covenant provisions of the Original Loan Agreement and the Loan Agreement from 1989–1994.

31. As a result of their increasing financial distress, Century formulated a plan in October 1989, called "Repositioning One" which was a detailed plan to cut expenses, and increase cash flow and working capital. (PX–19).

32. NatWest did not contribute to the formulation of Repositioning One. (PX–39, at 49).

33. Any comments by the NatWest regarding Repositioning One, were solicited by Century, and agreed to by Century. (PX–39, at 49–50, 66–67).

34. As part of Repositioning One, Century originated the idea to cut payroll by firing employees, freezing wages and reducing staffing ratios. (PX–19, at N11013; PX–39 at 58–62).

35. As part of Repositioning One, Century originated the idea to reduce fringe benefits, including suspending 401(k) Plan contributions. (PX–19, at N11013).

36. As part of Repositioning One, Century originated the idea to reduce marketing expenses. (PX–19, at N11014).

37. As part of Repositioning One, Century originated the idea to reduce general and administrative expenses. (PX–19, at N11015).

38. As part of Repositioning One, Century originated the idea to cut travel expenses. (PX–19; PX–39, at 63).

39. As part of Repositioning One, Century originated the idea to sell the corporate plane. (PX–19, at N11015).

40. As part of Repositioning One, Century originated the idea to defer capital expenditures, including, among other things, to delay indefinitely the opening of Defendants' facilities. (PX–19, at N11016).

41. Following Repositioning One, Defendants independently came to the conclusion that they had not done enough to cut costs. (PX–39, at 68). Century, and not NatWest, formulated another cost-cutting plan, called "Repositioning Two." (PX–39, at 68).

42. Century solicited the suggestions of NatWest as to Repositioning Two. (PX–39, at 75–76). Any suggestions by NatWest as to Repositioning Two were accepted by Century. (PX–39, at 75–76).

43. Among other things, Century proposed as part of Repositioning Two to reduce corporate office space. (PX–39, at 70).

44. Following Repositioning Two, Century decided to factor its receivables. (PX–39, at 88). The idea of factoring receivables was Century's, not NatWest's, and NatWest did not insist on receivable factoring. (PX–39, at 88).

45. In November 1990, Century defaulted on a $1 million payment to NatWest.

46. Century formulated and proposed a plan to NatWest to cut expenses and to pay NatWest. (PX–44).

47. Included in Century's plan, which Century formulated, were reduction in personnel in Century's corporate office, reducing field personnel, closing one hospital, delaying indefinitely the opening of another facility, reducing corporate office space through a sublease, selling the corporate aircraft, imposing wage reductions and salary freezes on corporate office and facility staff, eliminating country club memberships and luxury car allowances, reviewing specific assets to sell them, factoring receivables, and hiring an investment banker to seek investment capital and sell assets. (PX–44).

48. Century subsequently formulated another plan to increase cash flow and working capital and to pay NatWest under the note on which Century had defaulted. Under this proposal by Century, Century proposed to sell its Gerard facilities, factor receivables from various sources, sell its Newport Harbor Hospital, sell its Oak Grove facility, sell its Los Gatos facility, and to use Lew Kaufman, the investment banker Century decided to engage, to seek a $4–7 million capital injection from a third party. (PX–43).

49. As part of Defendants' proposal, Defendants recognized and accepted that their decision to seek $4–7 million in investor financing would result in the investor demanding significant control over the operations of Century. (PX–43, at N11187–8).

50. As part of their proposal, Century negotiated the split of proceeds from the sale of facilities between Century and NatWest, and requested that NatWest waive defaults by Century. (PX–44, 48).

51. Century subsequently proposed to close its facilities in Oak Grove and West Rivers, which Century described as a "prudent business move" and "consistent with the desires of prospective equity investors" which Century was seeking. (PX–49). Century subsequently found a purchaser for the

West Rivers facility and sought permission from NatWest to sell the facility, as it was subject to a lien held by the bank. (PX–54).

52. NatWest did not require Century to sell, close or not open facilities.

53. As part of their proposal, Defendants directed Lew Kaufman, the investment banker Century decided to engage, to seek a $4–7 million capital injection from a third party. (PX–43).

54. As part of Defendants' proposal, Defendants recognized and accepted that their decision to seek $4–7 million in investor financing would result in the investor demanding significant control over the operations of Century. (PX–43, at N11187–8).

55. Century declined to inform NatWest that their investment banker, Lew Kaufman, stated that the value of Century was probably zero. (PX–56, at 23).

56. Century proposed to reduce full time employees further, in both the Centralized Processing Office and the Management Information Systems areas. (PX–50).

57. NatWest did not require Century to fire employees, nor did NatWest dictate to Century the level of staffing it should employ.

58. Century decided to engage an investment banker named Lew Kaufman to find an equity investor for Century and to sell assets of Century. (PX–39, at 43; PX–35). Century negotiated the terms and scope of Mr. Kaufman's engagement. (PX–40, at 16).

59. Mr. Kaufman first contacted Columbia to seek an equity investment in Century. (PX–35).

60. Peter Alexis and Jim Hunt, employees of Columbia, first approached Fletcher McCusker, Century's Chief Operating Officer, to seek a business combination with Century. (PX–56, at 51, 98).

61. Century believed a business combination with Columbia was in Century's best interest. (PX–39, at 170; PX–40, at 81).

62. Century met on several occasions with employees of Columbia before informing NatWest that negotiations were occurring. (PX–40, at 76, 78–80; PX–56, at 98–99).

63. Century gave express permission for NatWest to contact Columbia. (PX–52).

64. Century's board of directors approved an agreement between Century and Columbia for Columbia to manage Century's operations. (PX–18).

65. From June, 1992 until service of its counterclaim in May, 1994, Century took no legal action to repudiate the 1992 restructuring agreement.

66. Century's director, Chief Executive Officer and primary shareholder, Jerry Dillon, received significant benefits from the June 1992 refinancing by which Columbia agreed to manage Century, including, among other things,

a. Mr. Dillon received $1.3 million in cash at the closing of the transaction in June 1992. (PX–29, at N1698). NatWest received $1.35 million in cash.

b. Mr. Dillon received an employment agreement for $200,000 per year. (PX–28).

c. Mr. Dillon received a bonus plan. (PX–28).

d. Mr. Dillon received a consulting agreement of $2,141,000. (PX–27, at N1673).

e. Mrs. Dillon also received a consulting agreement of $2,141,000. (PX–27, at N1665).

f. Mr. Dillon received 50% proceeds from the sale of assets which Century identified and agreed to sell. (PX–29, at N1701).

g. Mr. Dillon was released from his personal guarantee of his loan. (PX–30).

67. NatWest released liens on Defendants receivables, permitted Columbia a $4 million superpriority lien on Defendants' receivables, which induced Columbia to provide $4 million of working capital to Defendants, for their benefit.

68. NatWest did not cause Century to enter into a management agreement with Columbia.

69. At all times in restructuring its debt and it entering into a relationship with Columbia, Century was represented by independent counsel.

70. The asset sales contemplated by the June 1992 refinancing and restructuring

were originally selected by Century. (PX–43, at N11185–86; PX–44, at N12519; PX–48, at N13178; PX–49; PX–54).

71. Century negotiated with NatWest the sharing of proceeds from the asset sales contemplated in the June 1992 refinancing. (PX–40, at 30; PX–41, at 92). These assets were all subject to liens by NatWest. (PX–1, at 24 & Ex. J). Jerry Dillon received 50% of the proceeds of the asset sales contemplated by the June 1992 refinancing. (PX–29, at N1701; PX–41, at 75).

72. Century, and not NatWest, sought purchasers for the assets sales and negotiated the terms of their sale. (XP–43; PX–48; PX–49; PX–54).

73. Century paid a bankruptcy attorney a retainer of two hundred thousand dollars, and refused to seek the return to Century's account of the unspent portion thereof. (PX–40, at 57–58; PX–50, at N13139). This occurred during a period of time when Century was in monetary default on its Loan by NatWest.

74. NatWest suggested that Century review the contribution of a dozen relatives of Jerry Dillon on Century's payroll. Century did so, and some of them were severed, including two relatives of Mr. Dillon who were being paid to guard an unopened facility. (PX–42, at 81).

75. NatWest suggested that Century maintain a lockbox account with NatWest. Century refused, for doing so would have resulted in undue involvement by the bank in the company's operations. (PX–42, at 91–92; PX–24).

76. Century rejected suggestions by Nat-West that Century consider providing services to adults as well as children. (PX–42, at 73–76).

77. Century did not accept suggestions by NatWest that Century consider increasing outpatient services. (PX–40, at 19).

78. There is no reliable evidence that NatWest told Century not to make payroll. (PX–39, at 27).

79. NatWest did not threaten to take any action if Century paid payroll but did not pay interest or principal on the Note. (PX–39, at 27).

80. Century wrote to NatWest informing NatWest that Century had insufficient funds to make both payroll and debt service payments, and that Century had determined to make payroll instead of servicing the debt. (PX–55).

81. NatWest did not take over the operations of Century.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 in that the matter in controversy exceeds the sum of $50,000 and is between citizens of different states. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

2. Pursuant to the terms of the Loan Agreement, this action is governed by the law of the State of New York.

3. Century has breached the terms of the Note and Loan Agreement, and the Guarantors have breached the terms of their Guarantees.

4. Defendants are jointly and severally liable to NatWest in the amount of $29,885,-054.40, including interest through May 8, 1995. In addition, Defendants are jointly and severally liable to pay NatWest interest in the amount set forth in the loan agreement and the Interest Rate Protection Agreement from May 9, 1995 until the date of payment.

5. Defendants are jointly and severally liable to pay to NatWest the amount of $118,-243.09 which constitutes reasonable attorney's fees and costs incurred by plaintiff to March 31, 1995. In addition, Defendants are jointly and severally liable to pay to Plaintiff attorney's fees and costs incurred in the trial of this action.

6. Only in "rare instances" will a lender be found to have improperly dominated a debtor's business. *In re Teltronics Services, Inc.,* 29 B.R. 139 (Bankr.E.D.N.Y. 1983).

7. Lenders are afforded substantial leeway in dealing with a debtor in default,

and suggestions by a lender which are unpalatable to a borrower, regarding methods to increase revenues and decrease expenses, even when accompanied by an implicit threat that, unless such suggestions were taken, the lender would pursue its remedies under the loan agreement, do not suffice to state a cause of action for liability. *In re W.T. Grant Co.,* 699 F.2d 599, 609–10 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983); *Ford v. C.E. Wilson & Co., Inc.,* 129 F.2d 614 (2d Cir.1942).

■ 8. In order to find liability against a lender under a theory of a dominated and controlled instrumentality, the debtor must show actual, participatory, pervasive control of the debtor. *Krivo Industrial Supply Co. v. National Distillers and Chemical Corp.,* 483 F.2d 1098 (5th Cir.1973).

■ 9. It does not constitute an actionable claim for lender liability to repeatedly give restructuring suggestions to the debtor coupled with a threat of foreclosure if the suggestions were not followed. *In the Matter of Teltronics Services, Inc., supra.*

10. Suggestions by a major lender for a defaulted debtor to obtain new management, even when coupled by a threat of the exercise of its legal rights if the debtor does not comply, are both commonplace and completely proper. *See In re Prima Co.,* 98 F.2d 952 (7th Cir.1938); *cert. denied,* 305 U.S. 658, 59 S.Ct. 357, 83 L.Ed. 426 (1939); *In re Badger Freightways, Inc.,* 106 B.R. 971 (Bankr. N.D.Ill.1989); *Ford v. C.E. Wilson & Co., Inc.,* 129 F.2d 614 (2d Cir.1942); *Chicago Mill & Lumber Co. v. Boatmen's Bank,* 234 F. 41 (8th Cir.1916); *In re Teltronics Services, Inc., supra.*

■ 11. Direct, participatory control, on a day to day basis, required for a finding of liability against a lender, is not shown by mere suggestions by a lender to a borrower as to methods to improve the borrower's business, even if accompanied by a threat of foreclosure. *In re Teltronics Services, Inc., supra.*

■ 12. A creditor will be held to a fiduciary standard "only where his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been, to some extent, a merger of identity." *In re Teltronics Services, Inc., supra.*

■ 13. The choice of either filing bankruptcy or acceding to a lender's demands in order to avoid foreclosure does not without more constitute domination or control by the lender. *In re Prima Co.,* 98 F.2d 952 (7th Cir.1938); *cert. denied,* 305 U.S. 658, 59 S.Ct. 357, 83 L.Ed. 426 (1939).

■ 14. In order to repudiate an agreement that is claimed to have been entered into under duress, a debtor must show that a lender threatened to take action that was beyond the lender's legal rights. It does not constitute duress for a lender to threaten to exercise its rights. *Teachers Insurance and Annuity Association of America v. Wometco, Inc.,* 833 F.Supp. 344 (S.D.N.Y. 1993).

■ 15. If a party wishes to disaffirm a contract on the ground of duress, it must act promptly after entering into the contract, and not wait for a prolonged period after it has accepted substantial benefits under the contract. *Id.*

■ 16. Applying these principles, at no time did NatWest dominate Century's business or render Century a mere instrumentality or alter ego of NatWest, and thus did not dominate its business. Any constraint on Century's business decisions was the inevitable result of its inability to repay $30 million in secured debt. *See In the Matter of Clark Pipe Supply,* 893 F.2d 693, 699–700 (5th Cir.1990).

■ 17. Century was under no legally cognizable duress to either enter into a management agreement with Columbia or to enter into the 1992 Restructuring Agreement with NatWest. The only compulsion present was the possibility that NatWest might pursue its legal remedies. This, NatWest was entitled to do. "[T]here is generally no objection to a creditor's using his bargaining position ... to improve the status of his existing claims." *In re W.T. Grant Co.,* 699 F.2d 599, 610 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

18. In any event, Century's failure to file bankruptcy, or at least commence an action to challenge or repudiate the earlier matters and ultimately the 1992 Restructuring Agreement, more than two years ago, until after it was sued by NatWest, waives any claim of Century to assert duress now. *Teachers Insurance and Annuity Association of America v. Wometco, Inc.*, 833 F.Supp. 344 (S.D.N.Y.1993).

19. Defendants' counterclaim is dismissed.