In re KDI HOLDINGS, INC., Kolpen Distributors, Inc., KDI Specialty Foods, Inc. and KDI Atlantic Foods, Inc., Debtors.

The Official Committee of Unsecured Creditors of the Debtors,
Plaintiff,

v.

Austin Financial Services, Inc. and Yehochai Schneider a/k/a Joseph Schneider, Defendants.

Bankruptcy No. 97 B 48529(AJG).
Adversary No. 98/8471(AJG).

United States Bankruptcy Court,
S.D. New York.

March 8, 1999.

Finkel, Goldstein, Berzow, Rosenbloom
& Nash, LLP, Neal M. Rosenbloom, of
counsel, New York City, for Plaintiff.

Katten, Muchin & Zavis, Thomas F. Berner, of counsel, New York City, Katten, Muchin & Zavis, Jeff J. Marwil, Thomas J. Meier, Brian M. Graham, of counsel, Chicago, IL, for Defendant Austin Financial Services, Inc.

Luskin, Stern & Eisler, LLP, Michael Luskin, of counsel, New York City, for Defendant Joseph Schneider.

## MEMORANDUM DECISION REGARDING MOTIONS TO DISMISS DIVERSITY PROCEEDING

ARTHUR J. GONZALEZ, Bankruptcy Judge.

On May 21, 1998, the Official Committee of Unsecured Creditors of the Debtors (the "Committee") commenced the above-captioned adversary proceeding against Austin Financial Services, Inc. ("Austin") and Yehochai Schneider a/k/a Joseph Schneider ("Schneider"). By this action, the Committee seeks the following relief (1) equitable subordination of any and all claims and interests of Austin and Schneider to the claims of all creditors, (2) transfer of the lien securing such claims to and for the benefit of the estates of Kolpen Distributors, Inc. ("Kolpen"), KDI Speciality Foods, Inc. ("Specialty"), and KDI Atlantic Foods, Inc. ("Atlantic") (the "Operating Debtors"), (3) an order directing Austin to turnover to the estates of the Operating Debtors all sums paid to Austin on account of its claim arising from the loans made to the Operating Debtors totaling $3,550,000 (the "Austin Claim"), (4) an order deeming Austin and Schneider successors-in-interest to the Operating Debtors and liable for all debts and liabilities of the Operating Debtors, and (5) an order awarding the Committee the costs and expenses of this adversary proceeding. Both Schneider and Austin (the "Movants") filed separate motions to dismiss the adversary proceeding complaint pursuant to Fed. R.Civ.P. 12(b)(6).[1] For the reasons stated below, the Court denies the Movants' motions to dismiss.

## FACTS[2]

On December 24, 1997 (the "Petition Date"), each of the above-captioned debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code" or the "Code"). Pursuant to an order of this Court, these cases are being jointly administered for procedural purposes only. Prior to the Petition Date, three of the above-captioned debtors, Kolpen, Specialty, and Atlantic, were affiliated operating companies engaged in the business of distributing kosher food and specialty food products in the New York metropolitan area and elsewhere. The Operating Debtors shared a common credit facility pursuant to a Loan and Security Agreement with CIT Group/Credit Finance, Inc. ("CIT"). Pursuant to that agreement, CIT made revolving loans to the Operating Debtors up to a maximum of $5,000,000 (the "CIT Revolving Loan"), payment of which was secured by a continuing security interest in and a lien upon substantially all of the assets and properties of the Operating Debtors (the "CIT Collateral").

In the summer of 1997, it became apparent that despite the CIT credit facility the

1. Schneider indicates in his pleadings that his motion to dismiss "is based on the Notice of Motion and other papers filed by defendant Austin Financial Services Inc .... in support of its motion to dismiss" and that "Austin's papers are incorporated in full...." (Memorandum in Support of Defendant Joseph Schneider's Motion to Dismiss Adversary Complaint at 2).

2. The facts are taken from the Committee's complaint, as well as the documents referred to therein.

Operating Debtors could not generate sufficient cash flow nor did they have other capital resources to carry on their food distribution business through the profitable Passover holiday season. In an effort to obtain an additional infusion of capital, the Operating Debtors engaged in a series of discussions, initially with one of its main unsecured creditors Rokeach Food Corporation ("Rokeach"), and thereafter, through the auspices of Rokeach, with Joseph Shalgi and Schneider.

The Committee alleges that Joseph Shalgi was Chairman of the Board of Directors at Rokeach and its affiliate Rokeach Food Distributors ("RFD"), both of which were unsecured creditors of the Operating Debtors. Schneider, who is alleged to be Shalgi's first cousin, allegedly holds a controlling equity position of thirty-eight percent (38%) of the outstanding shares of stock of Austin Financial Services, Inc. (previously defined as "Austin"), where he also serves as the Chairman of the Board of Directors. In addition to the familial relationship between Schneider and Shalgi, the Committee alleges that they are long-standing business partners. In particular, both Schneider and Shalgi are involved with an Israeli corporation named Malibu, Inc. ("Malibu"). Schneider is the largest individual shareholder of Malibu, while Shalgi is the second largest, and serves a director, as well as its Chief Operating Officer. The Committee further alleges that "upon information and belief, Malibu owns all of the stock of MM Holdings, Inc., which owns 42% of a Delaware holding company, CB Holdings Corp., which in turn owns 100% of the

issued and outstanding stock of Rokeach Food Corporation" (previously defined as "Rokeach"). (Complaint at ¶ 9).

The discussions between Shalgi, Schneider, and the Operating Debtors allegedly led to the formation of KDI Holdings, Inc. ("Holdings" and together with the Operating Debtors, the "Debtors"). Holdings was allegedly formed "for the purpose of effectuating a modification of the equity ownership in, and control over the operation of, the Operating Debtors." (Complaint at ¶ 12). When Holdings was formed in August 1997, one-hundred percent (100%) of its stock allegedly was issued to Joseph Shalgi. On August 18, 1997, the Operating Debtors, their shareholders, and Holdings entered into a letter agreement (the "Letter Agreement") which provided that Holdings would use its best efforts to obtain additional financing[3] for the Operating Debtors, and would guarantee the repayment of such financing. (Letter Agreement at ¶¶ 1(c)(ii) and 2(b)). In return, the shareholders of the Operating Debtors agreed to: (1) grant the prospective lender a perfected security interest in all the tangible and intangible assets of the Operating Debtors (either directly or through participation in the CIT Revolving Loan), (Letter Agreement at ¶ 1(c)(i)); (2) "pledge all of their right, title and interest in and to the capital stock of the [Operating Debtors] to Holdings," (Letter Agreement at ¶ 1(c)(ii)); and (3) use the loan proceeds for payment of the obligations to RFD. (Letter Agreement at ¶ 5(a)). Pursuant to this agreement, Austin was listed as an unsecured creditor of Holdings in the amount of $3,550,000,

---

**3.** Paragraph 1 of the Letter Agreement states that "[t]he Companies [i.e., the Operating Debtors] acknowledge that Holdings has obtained for the Companies a loan in the sum of $250,000, which loan is represented by that certain Participation Term Note, dated August 8, 1997, issued by the Companies to the CIT

Group/Credit Finance, Inc. ...." (Letter Agreement at ¶ 1). In that the Committee refers in its complaint to loans made by Austin between "August 8, 1997 and October 1, 1997," the Court presumes that the amount referred to in ¶ 1 is included in the total amount of the Austin Loans.

based on Holdings' obligation as guarantor of the Austin Loans. (Local Rule 1007–2 Affidavit, Exhibit "A"). It should also be noted that Shalgi, as the sole shareholder of Holdings, was a signatory to the Letter Agreement.

During the period of August 8, 1997 through October 1, 1997, Austin made loans to the Operating Debtors totaling $3,550,000,[4] allegedly at the "instance [sic] and request of Holdings." (Complaint at ¶ 17). In connection therewith, Austin entered various agreements with CIT pursuant to which Austin received a subordinated participation in the CIT Revolving Credit Loan and the CIT Collateral (the "Austin Participation Interest") equal to the amounts advanced.[5] Pursuant to the terms of the Letter Agreement, after the closing of the second installment of the Austin Loans,[6] Holdings acquired a forty percent (40%) fully diluted equity interest and a fifty-one percent (51%) fully diluted voting interest in all of the capital stock of each of the Operating Debtors.

The Committee alleges that pursuant to the Letter Agreement, the Controlling Parties, a term defined as including Shalgi, Austin, Schneider, Rokeach, and RFD, caused $900,000 of the Austin Loans to be paid to RFD so as to bring current Kolpen's account. Moreover, other amounts of the Austin Loans were allegedly used on an ongoing basis to maintain that account, as well as those of Rokeach and its related entities.

Furthermore, based on the terms of the Letter Agreement and the placement of Schneider's son and former employees of Rokeach and RFD in key management positions of the Operating Debtors, the Committee alleges that the Controlling Parties "obtained unfettered control over the assets of the Operating Debtors and the performance of such Debtors' massive pre-petition obligations." (Complaint at ¶ 20). The Letter Agreement appears to have conveyed managerial control of the Operating Debtors to Holdings by providing that "no payments may be made by the [Operating Debtors] unless co-signed by the Holdings designee . . . ." (Letter Agreement at ¶ 1(b)(ii)). In addition, Ron Schneider was installed as a director and officer of Holdings, and as a director of each of its Operating Debtors. Larry Brownstein, a plant manager for Rokeach and/or RFD, was installed as president of Holdings and the Operating Debtors. Victor Ostreicher, the Chief Executive Officer of Rokeach and RFD, was installed as an officer of the Operating Debtors and as a signatory on their operating accounts. And Howard Freundlich, the Chief Operating and Financial Officer of Rokeach and

4. The Letter Agreement indicates that in addition to the $250,000 advanced to the Operating Debtors on August 8, 1997, that Holdings "would undertake to use its best efforts to obtain additional loans on behalf of the [Operating Debtors] aggregating a total of $2,750,000." (Letter Agreement at ¶ 1). However, in that the Subordinated Participation Agreements between CIT and Austin indicate that Austin's participation interest in the CIT Loans totaled $3,550,000, that amount will be considered controlling for purposes of this motion.

5. Austin and CIT entered into two Subordinated Participation Agreements, the first on

September 25, 1997, and the second on October 1, 1997. The latter agreement refers to the total amount alleged by the Movants to have been loaned by Austin, $3,550,000, and therefore, presumably supersedes the former agreement, which refers to a lesser amount of $3,150,000. In any event, the terms of the agreements are identical, except for the amount of the participation interest.

6. Referred to in the Letter Agreement as the "Second Additional Loan" in the amount of $1,550,000 to be made on or before September 10, 1997 (Letter Agreement at ¶ 1(b)(ii)).

RFD, was installed as an officer of the Operating Debtors and as a signatory on their operating account. Moreover, following the creation of Holdings, the facts presented by the Committee indicate that Schneider participated in the management of the Debtors. In a deposition taken by the Committee of Jeffrey Kolpen, one of the shareholders of the Operating Debtors, Mr. Kolpen states that "I remember Joe Schneider calling me on a Sunday night . . . to say that he was sending a trouble-shooter in from California that he has known and done business with for 20–some–odd years." (Committee's Reply, Exhibit "D" at 42).

The Committee further alleges that the Controlling Parties were "permitted to manipulate the material assets of the Operating Debtors in a manner so as to ensure full repayment of the secured Austin Claim by orchestrating the ultimate sale of the assets of the Operating Debtors to Distribution Acquisition Corp. ("DAC")." (Complaint at ¶ 22). The Court conducted a hearing on the sale on January 29, 1998 (the "Sale Hearing"), and approved that sale in an order dated February 9, 1998 (the "Sale Order").

## PROCEDURAL BACKGROUND

Pursuant to the Sale Order, Austin and Schneider received a general release from

any cause of action that could be filed by the Debtors, its creditors, or other parties-in-interest in these cases relating directly or indirectly to the Austin Loans.[7] The Committee was specifically excluded from the effect of this release so long as it "duly commence[d] an action against any of the Released Parties, a term including Austin and Schneider, seeking (1) damages on account of any of the Released Parties' conduct in connection with the Debtors and/or the Loan Documents and/or (2) avoidance of or subordination of Austin's interest in CIT's liens or claims upon assets of the Operating Debtors" by May 21, 1998 (the "Exclusion Period"). (Sale Order at ¶ 12). On May 20, 1998, the Committee and the Debtors presented to the Court for approval a stipulation in which the Debtors agreed to confer standing to the Committee to bring this adversary proceeding against Austin and Schneider on behalf of the Operating Debtors. The Court "so ordered" the stipulation on May 20, 1998 without hearing. On May 21, 1998, the Committee commenced this adversary proceeding.

## DISCUSSION

The Movants seek to dismiss the Committee's complaint pursuant to Fed. R.Civ.P. 12(b)(6), as incorporated into bankruptcy procedure by Fed. R. Bankr.P.

---

7. Sale Order at ¶ 11:

The Debtors, on behalf of themselves, all creditors and other parties-in-interest in these cases, including without limitation, any subsequently appointed trustee(s) in these proceedings, or any related chapter 7 proceedings (the "Releasors"), but specifically not including the committee of unsecured creditors of the Debtors (the "Committee"), do hereby waive and release Austin Financial Services, Inc. ("Austin") including its officers, directors, employees, agents, counsel, successors and assigns (the "Released Parties") of and from all claims rights, obligations, liabilities and causes of action of ev-

ery type and nature whatsoever, in law or equity, tort or contract relating directly or indirectly to the Debtors and/or that certain Loan and Security Agreement dated March 12, 1997 among The CIT Group/Credit Finance, Inc. ("CIT") and the Operating Debtors, and related documents and agreements, including without limitation, the Subordinated Participation Agreement between CIT and Austin which was acknowledged by the Operating Debtors (collectively the "Loan Documents"), that the Releasors may now or heretofore have or have had against the Released Parties (the "Release")[.]

7012(b)(6), for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). The Movants allege that the Committee lacks standing to commence this adversary proceeding on behalf of the Debtors and that the Committee's complaint does not state a claim upon which relief may be granted. In that the standing issue relates to the Court's jurisdiction, the Court will review that portion of the Committee's motion under Fed.R.Civ.P. 12(b)(1). *See Thompson v. County of Franklin,* 15 F.3d 245, 247 (2d Cir.1994) (expressing a preference to review motions to dismiss for lack of standing under Fed. R. Civ. P. Rule 12(b)(1): "While 'we realize that dismissals for lack of standing may be made pursuant to Fed.R.Civ.P. 12(b)(6) rather than 12(b)(1),' the Supreme Court instructs us that the standing 'inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.' " (internal citation omitted)).

■ In considering a motion to dismiss under either Fed.R.Civ.P. 12(b)(1) or 12(b)(6), the Court must accept as true all material facts alleged in the complaint and must draw all reasonable inferences in favor of the plaintiff. *See Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 62 (2d Cir.1997) (Fed.R.Civ.P. 12(b)(6)); *Thompson,* 15 F.3d at 249 (Fed. R. Civ.P.12(b)(1)) (*citing Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). The complaint must be "well pleaded" and the Court is not required to accept "sweeping unwarranted averments of fact," *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987), or "conclusions of law or unwarranted deduction." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 771 (2d Cir.1994), *cert. denied,* 513 U.S. 1079, 115 S.Ct. 728, 130 L.Ed.2d 632 (1995) (internal quotations omitted).

■ Under Fed.R.Civ.P. 12(b)(1), "[i]t is the burden of the party who seeks the exercise of jurisdiction in his favor ... clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute." *Thompson,* 15 F.3d at 249 (internal quotation marks omitted) (citations omitted). The Court should consider the contents of the complaint, but may "allow or require the plaintiff to supply, by amendment to the complaint or affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing." *Id.* (internal quotation marks omitted). Moreover, it may be necessary under Fed.R.Civ.P. 12(b)(1) for the Court "to resolve disputed issues of fact in order to determine a party's standing." *Id.* In doing so, the Court must make "an explicit explanation of its findings...." *Herbert · v. Nat'l Academy of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992). "[I]f after considering all the relevant materials, [the Court] is unable to discern a basis for the plaintiff's standing, the complaint must be dismissed." *Thompson,* 15 F.3d at 249.

■ Under Fed.R.Civ.P. 12(b)(6), in addition to the complaint itself, the Court may consider exhibits attached thereto or to which reference is made in the complaint, or matters of which judicial notice is taken. *See Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir. 1993). The Court should not dismiss a complaint under Fed R. Civ. P. 12(b)(6) "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

## I. FED. R. CIV. P. 12(b)(1): STANDING

■ Standing is a jurisdictional requirement that must be met in order to

have claims litigated in federal court. *See Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 117 (2d Cir.1991). In addressing this issue, the Court must engage in a two-tiered analysis, considering whether a plaintiff has standing based on the Constitution, as well as under "certain judicially-engrafted prudential principles...." *Official Committee of Unsecured Creditors of America's Hobby Center, Inc. v. Hudson United Bank (In re America's Hobby Center, Inc.)*, 223 B.R. 275, 280 (Bankr.S.D.N.Y.1998). The constitutional component consists of three elements:

> [(1)] the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, ... and (b) actual or imminent, not conjectural or hypothetical; [(2)] there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly ... trace[able] to the challenged action of the defendant, and not th[e] result [of] the independent action of some third party not before the court [; and (3)] it must be likely, as opposed to speculative, that the injury will be redressed by a favorable decision.

*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations and quotation marks omitted). The prudential considerations include "the general prohibition on a litigant's raising another person's legal rights, the rule barring adjudication of generalized grievances more appropriately addressed in the representative branches, and the requirement that a plaintiff's complaint fall within the zone of interests protected by the law invoked." *See Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (*citing Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S.

464, 474–475, 102 S.Ct. 752, 759–760, 70 L.Ed.2d 700 (1982)).

The Movants present two arguments in support of their position that the Committee lacks standing to have commenced this action. First, that the Committee failed to properly seek the required Court authorization prior to commencing this cause of action on behalf of the Debtors' estates. Second, the Movants allege that the Committee lacks standing because the doctrine of *in pari delicto* prevents the Committee from asserting a cause of action against Austin or Schneider on behalf of the Debtors' estates where the Debtors' principal engaged in the conduct that is the basis of the Committee's causes of action.

### Committee's Standing to Commence Action

The Movants argue that the Committee's complaint should be dismissed because it fails to seek Court authorization prior to commencing this adversary proceeding as is required by *Unsecured Creditors' Committee of Debtor STN Enterprises, Inc. v. Noyes (In re STN Enterprises)*, 779 F.2d 901, 904 (2d Cir.1985). The Movants assert that pursuant to *STN* and the cases interpreting it, the Committee was required to "file and serve a motion seeking Bankruptcy Court ... approval on the grounds that the debtor 'unjustifiably failed to bring suit or abused its discretion in not suing' to recover on behalf of the debtor's estate." (Movant's Response at ¶9). Here, the Committee did not serve or file a motion seeking such authorization, but rather entered into a stipulation with the Debtors conferring such authority to the Committee. The stipulation was approved by the Court without hearing. In addition, the Movants note that at least one court in this district has found that a court-approved stipulation conferring standing to a creditors' committee is not a proper substitute

for approval based upon Court review of the *STN* requirements. *See Crowthers McCall Pattern v. Lewis*, 114 B.R. 407, 409 (S.D.N.Y.1990) (remanding to the bankruptcy court to conduct an *STN* proceeding; noting that "a close reading of [*STN*] does not suggest any exceptions.") Therefore, by failing to obtain approval in the required manner, the Committee has not "duly commence[d]" this adversary proceeding by the deadline specified in the Sale Order. (Sale Order at ¶ 11). Accordingly, the Committee's adversary proceeding should be dismissed and the Committee should be considered bound by the release of Austin and Schneider contained in the Sale Order.

The Committee argues in response that it is unclear whether the Court needs to make an *STN* determination in this situation. The Committee contends that "*STN* . . . did not establish a rigid procedure for the bankruptcy court's threshold inquiry; instead . . . the court's examination of the standing issue could be predicated 'on affidavit and other submission, by evidentiary hearing or otherwise . . . .' " (Committee's Reply at 4). The Committee notes that although the court in *Crowthers* remanded to the bankruptcy court for the purposes of conducting an *STN* proceeding, it expressed misgivings as to whether *STN* applied in a case where the debtor, by court-approved stipulation, conferred authority to commence a particular cause of action to the creditors' committee. *See Crowthers*, 114 B.R. at 409 (finding that "it is by no means clear that the requirements of [*STN*] apply in these circumstances.")

Moreover, the Committee alleges that the terms and provisions of the Sale Order, which were actively negotiated by Austin, made it clear to the Court that only the Committee could bring this proceeding, thus, negating the need of an *STN* motion. The Court was "well ac-quainted with the facts underlying the Committee's claims" prior to the entry of the Standing Stipulation "by virtue of a series of submissions made by the Committee for authority to conduct Bankruptcy Rule 2004 examinations, as well as the Committee's application to the Court for an extension of the May 21, 1998 deadline and a series of hearings held thereon at which Austin's counsel actively participated . . . ." (Committee's Reply at 6). Therefore, the Committee contends, the hearings and submissions made prior to the entry of the Standing Stipulation are sufficient to confer standing to the Committee.

The Court agrees with *Crowthers* that the *STN* standard must be satisfied in all cases. Moreover, in this case, neither the Standing Stipulation, nor the Sale Order, provided the necessary findings to satisfy that standard. However, as found by the *Crowthers* court, under certain circumstances the Second Circuit does not preclude a court from retroactive consideration of whether the *STN* standard would have been established at the commencement of the action had a hearing been held at that time. Therefore, having concluded that the *STN* standard must be satisfied in order to maintain the action, the Court will first determine whether the facts of this case warrant its retroactive consideration and, if so, proceed with the consideration of that standard.

### 1. Availability of Retroactive Authorization to Commence Action on Behalf of Debtors' Estates

 "The general rule is that adversary proceedings instituted by the creditors' committee on the estate's behalf require prior court approval; in appropriate circumstances, however, a court may grant retroactive approval." *In re America's Hobby Center, Inc.*, 223 B.R. at 281 (*citing Committee of Unsecured Creditors v. DERF II (In re Catwil Corp.)*, 175 B.R.

362, 364 (Bankr.E.D.Ca.1994); *Chemical Separations Corp. v. Foster Wheeler Corp. (In re Chemical Separations Corp.)*, 32 B.R. 816, 819 (Bankr.E.D.Tenn.1983); *Liberty Mutual Ins. Co. v. Official Unsecured Creditors' Committee of Spaulding Composites Co. Inc. (In re Spaulding Composites Co., Inc.)*, 207 B.R. 899, 905 (9th Cir. BAP 1997)). Such appropriate circumstances include situations in which "[t]o hold otherwise would generate needless dismissals and refilings." *In re Spaulding Composites Co., Inc.*, 207 B.R. at 905. Moreover, such relief may be appropriate based on "the overall fairness concept of the bankruptcy laws [which] mandates that the debtor's transactions should not pass without examination." *Official Unsecured Creditors' Committee v. Rachles, Inc (In re Rachles, Inc.)*, 131 B.R. 782, 786 (Bankr. D.N.J.1991) (internal quotation marks omitted). In addition, "[r]etroactive approval has been granted when 'time was of the essence' because of a statute of limitations and where there was little 'likelihood of confusion' as to who would file an adversary proceeding." *In re America's Hobby Center, Inc.*, 223 B.R. at 281 (citations omitted).

In *America's Hobby Center*, the unsecured creditors' committee agreed to the entry of an order that provided for, among other things, the use of cash collateral. *See In re America's Hobby Center, Inc.*, 223 B.R. at 278. Pursuant to that order, the debtor agreed not to object to the validity of the secured creditor's prepetition security interest. *See Id.* The creditors' committee, however, was excluded from the debtor's release, and was given thirty (30) days within which to object to

the validity of the secured creditor's prepetition security interests. *See Id.* Subsequently, the committee conducted an investigation, but was unable to commence an adversary proceeding until the eve of the expiration of the thirty (30) day period. *See Id.* The creditors' committee did not seek court approval prior to commencing the adversary proceeding. *See Id.* Rather, it argued that it had standing to object to the bank's liens because the cash collateral order had conferred upon the committee the required standing. *See Id.* at 279. The committee also argued that a subsequent Bankruptcy Rule 2004 order "implicitly ratified [the Court's] previous Cash Collateral Order which explicitly gave the Committee the right to object to the validity of the [bank's] liens...." *Id.* at 280.

The court rejected both standing arguments. First, the court found that "in approving the cash collateral agreement I did not intend to cede my authority to the Committee" to determine when it would have standing to prosecute an action on behalf of the debtor's estate. *Id.* at 281. Rather, the court found that "[t]he [cash collateral] order says nothing one way or the other about court approval prior to suit." *Id.* In so finding, the court relied on *Crowthers*, a case in which the court found that even where a court-approved stipulation between the debtor and the creditors' committee "explicitly vested the committee with the right to conduct discovery and institute a suit[,]" the court was still required to "determine whether the suit which the committee wishes to interpose ought [to] be permitted." [8] *Id.* at 280. In addition, based on its conclusion that the

---

**8.** In that case, the creditors' committee and the debtor entered into a stipulation "authoriz[ing] the Creditors Committee to conduct discovery regarding the transactions and, 'if the Committee so determines' to commence litigation in the name of the Debtor."

*Crowthers*, 114 B.R. at 408. The bankruptcy court granted the motion to approve the stipulation, however, the district court, on appeal, remanded the matter to the bankruptcy court for the purpose of "carrying out the proceedings required" by *STN. Id.* at 409.

cash collateral order did not confer standing on the committee, the court also found that it "did not 'implicitly ratify' anything in the later [2004] order...." *Id.* at 281.

However, despite concluding that the creditors' committee lacked standing based on the prior orders, the court found that retroactive approval of the creditors' committee's adversary proceeding was appropriate. First, the commencement of the adversary proceeding by the committee "was a good faith attempt to object to [the] bank's liens or security interests fully within the spirit of the cash collateral agreement and order." *In re America's Hobby Center, Inc.*, 223 B.R. at 282. Moreover, there was little likelihood of confusion as to who would bring the lawsuit because as part of the cash collateral order the debtor had "contracted away its right to sue and more importantly, the bank ha[d] agreed that the Committee had a period of time in which to challenge its liens." *Id.* Finally, had the creditors' committee not commenced the adversary proceeding when it did, the period within which it could challenge the defendant's liens would have expired and the debtor's transactions would have passed without scrutiny. *See Id.*

 Similarly, this Court has found that *STN* must be satisfied and that the Sale Order and Standing Stipulation do not establish the findings required under *STN*. And as found in *America's Hobby Center* and *Crowthers*, the facts presented demonstrate that the Committee is entitled to consideration of the *STN* standard

even after the action was commenced. There was never any question that, as a result of the Sale Order, the only party entitled to bring this adversary proceeding was the Committee. As part of the Sale Order, negotiated by all of the parties-in-interest including Austin, only the Committee was specifically excepted from the release given to Austin and Schneider. Moreover, subsequent Bankruptcy Rule 2004 orders obtained by the Committee, the request for an extension of the Exclusion Period, as well as the Standing Stipulation, should have made it abundantly clear to the Debtors, Austin, and Schneider as to who would commence this action. Further, as stated in *America's Hobby Center*, the mere existence of the Exclusion Period, delineating the time period within which the Committee would have had to file an action against the Released Parties, is a further indication that there could be no confusion among the parties as to who would commence such an adversary proceeding.[9]

As to the issue of time constraints, the Committee had one-hundred and twenty (120) days under the Sale Order within which to duly commence an action against the Released Parties, a term including Austin and Schneider. Towards the end of that period, the Committee requested an extension of that period based upon what it alleged were delays in discovery due the actions of the Movants. The Court denied the Committee request. The Committee did not raise the need to prepare an *STN* motion as an additional basis for its re-

---

9. The Movants argue that in giving Austin and Schneider a release as part of the Sale Order, the Debtors tacitly admitted that they had conducted an investigation of Austin's and Schneider's behavior with regard to the Austin Loans, and concluded that no causes of action could be pursued against them. (Austin's Response at ¶ 11, n. 3). However, there is no evidence offered in support of the posi-

tion that the Debtors' decision not to pursue such causes of action was based upon an investigation as to their merits. Indeed, it was evident from the financing hearings and the Sale Hearing that the Committee took issue with the Debtors' ability or willingness to conduct an investigation because of the Debtors' relationship with Austin and Schneider.

quest. This is consistent with the Committee's position, argued here, that under the circumstances of this case, an *STN* motion is not required. However, had the Exclusion Period expired without the Committee commencing this adversary proceeding, Austin and Schneider would be immune from suit based on the Austin Loans, and the ability to review their roles in the Debtors' prepetition loan transactions would be lost forever. Such a result is contrary to "the overall fairness concept of the bankruptcy laws [which] mandates that the debtor's transactions should not pass without examination." *In re Rachles, Inc.*, 131 B.R. at 786.

Moreover, many if not all of the *STN* factors were raised before the Court in the context of the various financing hearings and the Sale Hearing, all of which occurred prior to the entry of the Standing Stipulation. In *America's Hobby Center*, the creditors' committee relied on the terms of the cash collateral and Rule 2004 order in claiming that it had standing, and not on the argument that *STN* had been satisfied. In addition, in *Crowthers* the creditors' committee argued that *STN* did not apply in cases where the debtor consensually confers standing to the creditors' committee. It does not appear in those cases that the *STN* issues were as fully developed before the Court as they were in this case prior to the commencement of the action.

In addition, the policy concern that without court approval, pursuant to the *STN* standard, the Committee would interfere with the Debtors' reorganization is not an issue here. At this point, the Operating Debtors have sold all of their assets. Thus, if this case is to be confirmed, it will be in the context of a plan of liquidation. Under such circumstances, this litigation will not delay the confirmation of a plan because any proceeds that come into the

Debtors' estates as a result of the successful conclusion of this adversary proceeding can be distributed pursuant to a liquidation plan.

Therefore, based on the foregoing, the Court finds that retroactive consideration of the Committee's standing, under the standard set forth in *In re STN Enterprises*, to commence this adversary proceeding on behalf of the Debtors' estates is appropriate.

### 2. Application of the *STN* Standard

▉ The Committee seeks to pursue this adversary proceeding on behalf of the Debtors' estates. Ordinarily, only the trustee or debtor-in-possession has standing to assert an equitable subordination, *see ABF Capital Mgmt. v. Kidder Peabody & Co., Inc. (In re Granite Partners L.P.),* 210 B.R. 508, 516 (Bankr.S.D.N.Y.1997) (noting principle "that where inequitable conduct causes direct injury to the estate, the trustee is the proper party to assert it on behalf of the creditors.") (citations omitted) or lender liability cause of action. *See Keene Corp. v. Coleman (In re Keene Corp.),* 164 B.R. 844, 852 (Bankr.S.D.N.Y. 1994) ("once bankruptcy ensues, the trustee alone has standing to prosecute" a claim for piercing the corporate veil; "under New York law, the trustee has standing to assert claims based upon piercing the corporate veil or alter ego liability.") However, pursuant to §§ 1103(c)(5) and 1109(b) of the Bankruptcy Code, a creditors' committee has an "implied, but qualified, right . . . to initiate adversary proceedings in the name of the debtor-in-possession[,]" upon "approval of the bankruptcy court." *In re STN Enterprises,* 779 F.2d at 904. To determine whether the Committee properly commenced this adversary proceeding on behalf of the Operating Debtors' estates, the Court must consider two factors: (1) whether the Committee presented any colorable claim(s), and (2)

whether the action asserting such claim(s) is likely to benefit the reorganization estate. *Id.* at 905. In determining whether there is a colorable claim, the Court must engage in an inquiry that is "much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." *In re America's Hobby Center, Inc.*, 223 B.R. at 281 (citation omitted). As to a claim's potential benefit to the reorganization estate, the Court must consider the probability of "legal success and potential financial recovery" to the estate, "whether it would be preferable to appoint a trustee," and "the terms relative to attorneys' fee on which suit might be brought." *In re STN Enterprises*, 779 F.2d at 905.

### a. Colorable Claims

### (i) Equitable Subordination

The Committee seeks to subordinate claims held by Austin and Schneider based on the Austin Loans. As stated previously, Austin allegedly made loans totaling $3,550,000 to the Operating Debtors by entering into Subordinated Participation Agreements with CIT. CIT's secured claim against the Operating Debtors at the time the assets were transferred pursuant to the Sale Order, including the Austin Loans, totaled approximately $9,000,000. The Committee also alleges that Schneider holds a contingent secured claim based on his guarantee of the Austin Loans. On February 9, 1998, the Court signed the Sale Order, pursuant to which DAC was the successful purchaser of the assets of the Operating Debtors. As consideration for those assets, DAC agreed, among other things, to assume all of the CIT liens against the Operating Debtors, including the liens securing the Austin Loans. Under the Sale Order the liens remained on the transferred assets representing the allowed secured claims. But for purposes of

equitable subordination, the Sale Order provides the Committee with the mechanism to challenge those claims as to the Released Parties, provided that the action was commenced within the Exclusion Period.

Therefore, if as a result of this proceeding, Austin's secured claim is equitably subordinated and the corresponding lien is transferred to the Debtors' estates, DAC would subsequently make payment on Austin's interest to the Debtors' estates, either directly or through CIT, rather than to Austin. The same result would appear to be the outcome where Austin's claim is equitably subordinated and Schneider is then subrogated to Austin's claim. *See generally Fisher v. Outlet Company (In re Denby Stores)*, 86 B.R. 768, 775 (Bankr. S.D.N.Y.1988) ("The doctrine of subrogation enables one who pays the debt of another to stand in the shoes of the latter party and assert whatever rights that party held.") Yet, even if Austin's secured claim is not equitably subordinated, Schneider's contingent secured claim may be equitably subordinated based on Schneider's conduct alone.

Section 510(c) of the Bankruptcy Code provides that the Court may—

(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all of part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or

(2) order that any lien securing such subordinated claim be transferred to the estate.

11 U.S.C. § 510(c). In determining whether equitable subordination of a claim or interest is appropriate, Courts have uniformly considered the following: (1) whether the claimant engaged in some

type of inequitable conduct; (2) whether the misconduct caused injury to the creditors or conferred an unfair advantage on the claimant; and (3) whether equitable subordination of the claim is consistent with bankruptcy law. *See Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 700 (5th Cir.1977) (*cited with approval United States v. Noland*, 517 U.S. 535, 538, 116 S.Ct. 1524, 134 L.Ed.2d 748 (1996)). The third prong of this test is likely to be moot due to the enactment of § 510(c) of the Bankruptcy Code. *See 80 Nassau Assocs. v. Crossland Fed. Savings Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 841 (Bankr.S.D.N.Y.1994) ("since the Bankruptcy Code, unlike its predecessors, expressly authorizes the remedy of equitable subordination, the third prong of the Mobile Street test is likely to be moot.") To satisfy the second prong, the proponent of equitable subordination need only allege "that general creditors are less likely to collect their debts" as a result of the allegedly inequitable conduct. *Id.* at 840 ("If misconduct results in harm to the entire creditor body the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general concrete manner.")

The Court must also consider certain principles when analyzing an equitable subordination claim. In particular, "the inequitable conduct of the claimant need not have been related to the acquisition or assertion of his claim in order to warrant subordination," *Anaconda–Ericsson, Inc. v. Hessen (In re Teltronics Services, Inc.)*, 29 B.R. 139, 168 (Bankr. E.D.N.Y.1983) and "equitable subordination is remedial, not penal, ... a claim will be subordinated only to the extent necessary to offset the harm that resulted." *In re 80 Nassau Assocs.*, 169 B.R. at 840.

*Claims*

Section 510(c) of the Bankruptcy Code indicates that only "allowed claims" are subject to equitable subordination. 11 U.S.C. § 510(c). In this case, the issue is whether Austin, and therefore Schneider, should be considered to have held allowed claims, as of the date of the Sale Hearing, against the Operating Debtors which are subject to equitable subordination.

Austin contends that it is not subject to the Committee's equitable subordination cause of action because it does not hold an allowed secured claim against the Operating Debtors. Instead, CIT, as the lead lender, is the sole possessor of the right to assert a claim against the Operating Debtors to recover Austin's participation interest in the CIT loans. *See, e.g., In re Yale Express System, Inc.*, 245 F.Supp. 790 (S.D.N.Y.1965) (holding that a participant has no right to setoff borrower's account at participant bank); *In re Coronet Capital Co.*, 142 B.R. 78, 82 (Bankr.S.D.N.Y.1992) (finding that "only the lead lender can seek legal recourse against to borrower.") Moreover, the Subordinated Participation Agreement provides that only "CIT shall have the right to take all actions and proceedings, judicial and otherwise, that CIT may deem necessary or proper to protect the joint interests provided herein." (Subordinated Participation Agreement, dated October 1, 1997, at ¶ 7)

The Committee argues in response that "by virtue of the provisions of the Sale Order ... Austin agreed to permit the Committee to proceed directly against Austin and its officers, directors, employees and agents, without any necessity of joining CIT as a party...." (Committee's Response at 11). Alternatively, the Committee argues that the Court cannot determine, based on the limited facts before it, whether Austin's advance of funds to CIT for the benefit of the Debtors was a true

participation or a disguised loan to the Debtors giving rise to an independent claim held by Austin. The basis of the latter argument is, in part, the deposition testimony of Robert Strack, an employee of CIT Group/Credit Finance, Inc., where he stated that initially a loan from Austin to the Operating Debtor's was contemplated, but that ultimately Austin took a junior participation interest in the CIT loans because it was faster. (Committee's Response, Exhibit "B" at 42). The Committee also alleges that Austin, and not CIT, was the beneficiary of a guarantee by Holdings of repayment of the amount of the Austin Loans.

The Court finds that the facts alleged may be sufficient to establish that Austin's alleged participation interests in the CIT loans are properly characterized as direct loans to the Operating Debtors, thereby giving Austin an allowed secured claim directly against the Operating Debtors at the time of the Sale Hearing. *See generally Orr v. Kinderhill Corp.*, 991 F.2d 31, 35 (2d Cir.1993) ("In equity, 'substance will not give way to form, [and] technical considerations will not prevent substantial justice from being done.'") Alternatively, the Court finds that, under the provisions of the Sale Order and negotiations that took place regarding same, that the Committee may be able to establish that Austin should be considered as holding an allowed secured claim directly against the Operating Debtors, and independent of CIT's secured claim. Specifically, the facts alleged by the Committee may establish that the intent of the parties in negotiating the Sale Order was to amend the Subordinated Participation Agreements to allow Austin, and therefore Schneider, to hold a separate independent claim against the Operating Debtors for the purposes of particular causes of action. Paragraph 12 of the Sale Order provides that, to avoid being bound by the general release of Austin and

Schneider, the Committee must commence a cause of action against the "Released Parties," a term which includes Austin and Schneider, but not CIT. Moreover, one of the causes of action the Committee was specifically authorized to bring against the Released Parties was the "avoidance or subordination of Austin's interest in CIT's liens or claims upon assets of the Operating Debtors (the "Action")." (Sale Order at ¶ 12). In addition, pursuant to ¶ 13, CIT received a complete release from any cause of action being brought against it with regard to any portion of its claim. Excluded from this release, however, was that portion representing the Austin participation interest. These provisions may indicate the intent of the parties was to prevent CIT from having to defend against an action to equitably subordinate that portion of its secured claim representing Austin's participation agreement. Therefore, it is logical to infer from those same provisions that the parties intended to consider Austin as holding an allowed secured claim against the Operating Debtors.

As to Schneider, the complaint alleges that he may have a contingent claim "by way of subrogation pursuant to his guaranty of payment of the Austin Loans." (Complaint at ¶ 30). Therefore, in that the Court has already found that sufficient facts have been alleged to show that Austin may have an allowed secured claim directly against the Operating Debtors, Schneider therefore may hold a allowed contingent secured claim directly against the Operating Debtors by virtue of its right to be subrogated to Austin's claim. In addition, there is no issue as to whether Schneider's claim may otherwise be subject to equitable subordination because a contingent claim falls within the Bankruptcy Code's definition of claim. *See Christian Life Ctr. Litig. Defense Comm. v. Silva*, 821 F.2d 1370, 1375 (9th Cir.1987)

("As a contingent claim is defined as a 'claim' it can be subordinated to other claims under principles of equitable subordination.")

Accordingly, the Committee has alleged sufficient facts which may establish that Austin and Schneider hold allowed claims subject to the Committee's equitable subordination cause of action.

*Insider Status*

■■■■ In considering whether Austin and Schneider engaged in inequitable conduct, the Court must first determine whether either or both are insiders of the Debtors. "The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of the misconduct required to be shown and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors." *In re Teltronics Services, Inc.,* 29 B.R. at 169. "While the general standard for non-insider creditors is egregiousness and severe unfairness in relation to other creditors," *Herzog v. Leighton Holdings, Ltd. (In re Kids Creek Partners, L.P.),* 212 B.R. 898, 928 (Bankr.N.D.Ill.1997), insider claims have been equitably subordinated in cases involving "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimant." *In re 80 Nassau Assocs.,* 169 B.R. at 837.

■■■■ "Although the Bankruptcy Code defines the term 'insider', 11 U.S.C. § 101(31), courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term 'insider' must be flexibly applied on a case-by-case basis." *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 498 (S.D.N.Y.1994) (citations omitted). The legislative history of § 101(31) indicates that the term applies to "one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor." *Id.* (*quoting* S.Rep. No. 989, 95th Cong., 1st Sess. 25 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5810, 6269) (legislative history 11 U.S.C. § 101(31)) (other citations omitted). In cases involving non-management creditors, a creditor will be held to an insider standard where it is found that it dominated and controlled the debtor. *See* Andrew DeNatale & Hon. Prudence B. Abram, *The Doctrine of Equitable Subordination as Applied to Non-management Creditors,* 40 Bus. Law. 417, 432 (February 1985). To establish domination and control by a lender, the allegations must indicate something more than the monitoring of a debtor's operations and proffering advice to management, even where the lender threatens to withhold future loans should the advice not be taken. *See Cosoff v. Rodman (In re W.T. Grant Co.),* 699 F.2d 599, 610 (2d Cir.), *cert. denied,* 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983).

In *W.T. Grant Co.,* the Second Circuit reviewed the district court's judgment affirming a global settlement previously approved by the bankruptcy court. The debtor, which operated a large chain of retail stores, had outstanding debts to a group of debenture holders, as well as a number of banks based on lines of credit. The indenture trustee argued that based on the conduct of the banks the "subordinated debentureholders [should] be accorded a status prior to that of the banks." *In re W.T. Grant Co.,* 699 F.2d at 604. The main argument of the indenture trustee in support of equitable subordination was that the banks were "running" the debtors. The Second Circuit refuted this argument, finding:

> There is no doubt that, at least from March of 1974, the banks kept careful watch on what was going on at Grant

[the debtor]; they would have been derelict in their duty to their own creditors and stockholders if they had not. It is not uncommon in such situations for officers whose companies have been brought to the verge of disaster to think that they still have better answers than do outsiders. In order to establish their claims the appellants must show not simply that the banks proffered advice to Grant that was unpalatable to management, even advice gloved with an implicit threat that, unless taken, further loans would not be forthcoming. They must show at least that the banks acted solely for their own benefit ..., and adversely to the interest of others.

*In re W.T. Grant Co.*, 699 F.2d at 610.

 Moreover, courts suggest that a "non-insider creditor will be held to a fiduciary standard only where his ability to command the debtor's obedience to his policy directives is so overwhelming that there has been, to some extent, a merger of identity." *In re Teltronics Services, Inc.*, 29 B.R. at 171. In determining the issue of "control," courts have considered a number of factors, including: (1) control over the debtors voting stock; (2) managerial control, including personnel decisions and decisions as to which creditors should be paid; (3) whether the relationship between the debtor and lender was the result of an arms-length transaction, *see Smith v. Associates Commercial Corp. (In re Clark Pipe and Supply Co., Inc.)*, 893 F.2d 693, 700 (5th Cir.1990); *In re Teltronics Services, Inc.*, 29 B.R. at 171; *Bergquist v. First Nat'l. Bank of St. Paul (In re American Lumber Co.)*, 5 B.R. 470, 477 (D.Minn.1980); *In re Process–Manz Press, Inc.*, 236 F.Supp. 333, 348 (N.D.Ill.1964), *rev'd on other grounds*, 369 F.2d 513 (7th Cir.1966); and (4) whether the lender is the debtors sole source of credit. *See In re American Lumber Co.*, 5 B.R. at 477.

In this case, if proven, the facts alleged may establish that Schneider and Austin did more than merely proffer advice or monitor the Debtors' operations. Instead, it appears through a relationship with Shalgi, as well as by providing the Austin Loans, Austin and Schneider may have gained control over the Debtors. The Committee alleges that Schneider, the controlling shareholder and Chairman of the Board of Directors of Austin, and Shalgi, the Chairman of the Board of Directors of Rokeach, are first cousins and long-standing business partners. This partnership includes sharing an interest in Malibu, an Israeli corporation which holds an interest in Rokeach and RFD, unsecured creditors of the Operating Debtors. Such a relationship may indicate that Schneider and Austin enjoyed control over the Debtors. This argument is bolstered by the fact that Schneider's son, himself is a 1.7% equity holder of Austin, served as a director and officer of Holdings, and as a Director of each of the Operating Debtors. Moreover, a number of former employees of Rokeach and RFD became key management figures with Holdings and the Operating Debtors.

There are also indications that Schneider engaged in the direct management of the Debtors. In a deposition taken by the Committee of Jeffrey Kolpen, one of the shareholders of the Operating Debtors, Mr. Kolpen states that "I remember Joe Schneider calling me on a Sunday night ... to say that he was sending a troubleshooter in from California that he has known and done business with for 20–some–odd years." (Committee's Reply, Exhibit "D" at 42). This statement indicates that Schneider had direct participation in choosing who would be employed by the Debtors at a management level.

Moreover, the Letter Agreement conferred to Holdings both a controlling amount of the Operating Debtors capital

and voting equity, as well as managerial control. Following the second installment of the Austin Loans, the shareholders of the Operating Debtors conveyed a forty percent (40%) equity interest and a fifty-one percent (51%) voting interest in the Operating Debtors to Holdings. Moreover, ¶ 1(b)(ii) of the Letter Agreement provides that "no payments may be made by [the Operating Debtors] unless co-signed by a Holdings designee...." Therefore, through their relationship with the Debtors, Schneider and Austin gained both voting control, as well as the ability to dictate which creditors would be paid. Moreover, as a condition to the Austin Loans, $900,000 of the proceeds of such loans were to be paid to RFD, an unsecured creditor of the Operating Debtors, and a company in which Schneider and Shalgi allegedly hold an interest. Schneider's involvement in the discussions with the Operating Debtors prior to the creation of Holdings, the timing of the Austin Loans, as well as Schneider's apparent involvement in the management of the Debtors indicate that Schneider may have been indirectly involved in the negotiation of the Letter Agreement. Based on those facts, it would appear to be of little consequence that neither Austin, nor Schneider, signed the Letter Agreement.

In addition, the Austin Loans do not appear to have been the result of an arms-length transaction. It is clear from the record that when the Operating Debtors approached Shalgi and Schneider they were experiencing a period of financial difficulty. CIT, the Operating Debtors prior lender, had decided not to provide any further financing, leaving the Operating Debtors without working capital with which to continue to operate. Based upon the facts as alleged, Schneider and Austin apparently used that situation to take control over the Operating Debtors for their own benefit and to the detriment of the creditors of the Operating Debtors.

In response, Austin argues that Schneider's alleged connections with the Debtors cannot be imputed to Austin. Austin argues that by requiring Schneider to personally guaranty the amounts to distributed the Operating Debtors, it is clear that Schneider "was not pulling the strings at Austin." (Austin's Reply at 11). However, although Schneider's guaranty of Austin's participation interest may support Austin's position as to the degree of Schneider's control over Austin, it does not render implausible the Committee's argument that Schneider acted on Austin's behalf. In particular, to establish Schneider's relationship with Austin, the Committee alleges that Schneider was Chairman of the Board of Directors at Austin and held a controlling amount of its shares, allegedly thirty-eight percent (38%) of the issued and outstanding shares of stock. Moreover, the fact that the advances from Austin to the Operating Debtors allegedly "coincided with a change in both voting control and actual day-to-day management of the Operating Debtors" to a person allegedly closely related to Schneider also indicates that Schneider either controlled Austin, or acted on Austin's behalf. (Committee's Response at 15). The Court finds that based on the facts alleged, a reasonable inference can be drawn establishing that Schneider acted on Austin's behalf.

*Inequitable Conduct*

As stated previously, courts have equitably subordinated insider claims in cases involving "(1) fraud, illegality or breach of fiduciary duty, (2) undercapitalization, and (3) control or use of the debtor as an alter ego for the benefit of the claimant." *In re 80 Nassau Assocs.*, 169 B.R. at 837. In this case, in addition to alleging facts that the Debtors were the alter egos of

Schneider and Austin, the Committee alleges that upon gaining control of the Debtors, Austin breached its fiduciary duty by making secured loans to the Operating Debtors in lieu of an equity investment at a time when the Debtors were undercapitalized. As a consequence of the Austin Loans, the Committee alleges that the assets of the Operating Debtors were over-leveraged to the detriment of unsecured creditors. (Complaint at ¶ 25).

To establish that the Debtors were undercapitalized at the time the Austin Loans were made, the Committee must allege sufficient facts to establish that the Debtors had: "(1) insufficient initial capitalization to make a business similar to the debtor a viable business; or (2) inadequate capitalization to obtain equivalent advances from an informed outside lender." *In re Kids Creek Partners,* 212 B.R. at 931 (citations omitted). The Committee alleges that "[d]uring the summer of 1997, it became apparent that, despite the CIT credit facility, the operating Debtors could not generate sufficient cash flow nor did they have other sufficient capital resources to carry on their food distribution business through the Passover holiday season." (Complaint at ¶ 15). This allegation was adopted by Austin in its Motion to Dismiss. (Austin's Reply at ¶ 1) ("By the summer of 1997, the Operating Companies desperately needed additional working capital to continue to do business through the upcoming Passover holiday season.") The Court finds that the facts alleged may establish that the Debtors were undercapitalized at the time the Austin Loans were made.

■ However, an insider's infusion of money into a financially distressed company in the form of a loan does not necessarily amount to inequitable conduct. *See In re Madelaine, Inc.,* 164 F.2d 419, 420 (2d Cir.1947). *See also Rego Crescent Corp. v.*

*Tymon (In re Rego Crescent Corp.),* 23 B.R. 958, 965 (Bankr.E.D.N.Y.1982) ("in many cases where the courts have subordinated debts arising from insider loans there has been some inequitable conduct in addition to undercapitalization.") In *Madelaine,* upon obtaining all of the shares of stock in a corporation, the nine shareholders, four (4) of whom became directors of the corporation, made loans of $3,000 each to the corporation. *See Id.* The trustee in bankruptcy sought to recharacterize those loans from shareholders/directors as equity. *See Id.* The Circuit found that "[t]here is nothing illegal in an officer or director lending money to his corporation provided he does not use his corporate position to defraud creditors or take unfair advantage of them." *In re Madelaine, Inc.,* 164 F.2d at 420. Accordingly, to determine whether the actions of Austin and Schneider regarding the Austin Loans amounts to inequitable conduct, the Court must consider whether the Committee has alleged sufficient facts to establish that the alleged misconduct, in this case the taking of an unfair advantage, resulted in injury to the Debtors' creditors.

■ As stated previously, to satisfy this prong of the equitable subordination standard, the Committee need only allege "that general creditors are less likely to collect their debts" as a result of the alleged inequitable conduct. *In re 80 Nassau Associates,* 169 B.R. at 840. "If misconduct results in harm to the entire creditor body the objecting party need not identify the injured creditors or quantify their injury, but need only show that the creditors were harmed in some general, concrete manner." *Id.* (citation omitted). The Committee alleges that because of the Austin Loans, Austin and others were able to "acquire the Operating Debtors and control the disposition of their material assets in derogation of the rights of

general unsecured creditors of the operating debtors." (Complaint at ¶ 27). Moreover,

[s]uch conduct by the Controlling Parties has injured the unsecured creditors of the Operating Debtors and conferred an unfair advantage on the Controlling Parties by permitting them to dictate the disposition of the material assets of the estates of the Operating Debtors for their own selfish reasons, while at the same time securing the Austin Claim ahead of the claims of unsecured creditors who will receive far less than full payment on their just claims pursuant to any plan of liquidation in the Chapter 11 cases.

(Complaint at ¶ 29). The Committee further alleges that

the Austin participation resulted in the substitution of additional debt for risk capital, while at the same time acceding control of the Operating Debtors to the Controlling Parties. The disproportionately high share of debt funding resulting from the Austin advances increased the risk of failure of the Operating Debtors, while at the same time insuring that Austin would be repaid ahead of the then existing creditors.

(Committee's Response at 18).

Based on the facts as alleged, a logical inference can be drawn that the further leveraging of the Operating Debtors' assets through the Austin Loans made it less likely that the unsecured creditors would receive payment on their claims. In addition, if true, the facts indicate that through its relationship with Shalgi, control over the Operating Debtors was gained by Schneider and Austin without putting their capital at risk as an equity investment, thereby receiving an unfair advantage. The Committee also alleges that Austin and Schneider used their control over the Debtors to cause the transfer of $900,000

of the Austin Loans to RFD, in full repayment of its prepetition claim against Kolpen, and to cause the transfer of additional amounts of the Austin Loans to maintain the RFD and the other Rokeach accounts. Such payments are arguably preferential. Based on Schneider's alleged interest in Rokeach via Malibu, such transfers may also constitute self dealing, in that it may establish that Austin and Schneider converted an unsecured debt, held by RFD and Rokeach, into a secured debt held by Austin.

Therefore, based on the foregoing, the Court finds that the Committee has alleged sufficient facts which may establish that Austin's allowed secured and Schneider's allowed contingent secured claims should be equitably subordinated to the claims of general unsecured creditors.

### (ii) Lender Liability

 The Committee alleges as its second cause of action:

By virtue of the aforesaid scheme, whereby officers and directors of the Operating Debtors were installed by the Controlling Parties, the Controlling Parties obtained unfettered control over the performance of the Operating Debtors' pre-petition obligations and dictated the payments which were to be made, and the extent of such payments, to the creditors of the Operating Debtors ... the Controlling Parties, including defendants Austin and Schneider, in effect became successors to the Operating Debtors and responsible for all debts of those corporations.

(Complaint at ¶¶ 32 and 33). Lender liability is established by application of the instrumentality doctrine, which requires:

(1) Control, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the

transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or worse, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights; and

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Fisser v. International Bank,* 282 F.2d 231, 238 (2d Cir.1960) (*citing Lowendahl v. Baltimore & Ohio R.R. Co.,* 247 A.D. 144, 287 N.Y.S. 62, 76, *aff'd.,* 272 N.Y. 360, 6 N.E.2d 56) (1936). To establish lender liability through the use of the instrumentality doctrine in the context of a creditor-debtor relationship, "courts require a strong showing that the creditor assumed actual, participatory and total control of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control...." *Krivo Industrial Supply Co. v. National Distillers and Chem. Corp.,* 483 F.2d 1098, 1105 (5th Cir.1973), *reh'g denied,* 490 F.2d 916 (5th Cir.1974). *See also National Westminster Bank USA v. Century Healthcare Corp.,* 885 F.Supp. 601, 603 (S.D.N.Y.1995) (quoting *Krivo*). Moreover,

> [l]ender liability is predicated on an unmistakeable showing that the subservient corporation in reality has no separate, independent existence of its own and was being used to further the purposes of the dominant corporation.

Suggestions by a major lender for a defaulted debtor, even when coupled with a threat of the exercise of its legal rights if the debtor does not comply, are both commonplace and completely proper.

*National Westminster,* 885 F.Supp. at 603.

Based on the Court's discussion of "insider status" regarding the Committee's equitable subordination claim, the Court finds that the Committee has alleged sufficient facts to establish the control element of the lender liability claim against both Schneider and Austin.[10] The Committee alleges that by making the Austin Loans, Schneider and Austin gained actual managerial and voting control over the Debtors through Schneider's close familial and business relationship with Shalgi. This is not a case in which Schneider or Austin simply monitored the Debtors' situation or suggested a course of action the Debtors ought to follow to improve their financial situation, *see National Westminster,* 885 F.Supp. at 601, nor where the lender even threatened to exercise its legal rights should the debtor fail to acquiesce to the lender's suggestions. *See Harris Trust & Sav. Bank v. Keig (In re Prima Co.),* 98 F.2d, 952, 965 (7th Cir.1938), *cert. denied,* 305 U.S. 658, 59 S.Ct. 358, 83 L.Ed. 426 (1939). Instead, if proven, the facts alleged by the Committee establish that Austin and Schneider took over the day-to-day management of Debtors, and directed the payment of certain debts to corporations in which Austin and Schneider had an interest.

---

**10.** Although the severity of the conduct needed to establish the control element of lender liability is generally greater than that needed to establish "domination and control" for equitable subordination purposes, *see* DeNatale & Abram, *supra,* at 442–443 ("The level of control required before the instrumentality rule will be applied, however, is not necessarily the same level of control required for the application of equitable subordination."), in this case the allegations regarding the control element in the equitable subordination discussion are sufficient to establish this element of lender liability.

Moreover, the Committee's allegations of inequitable conduct also serve to establish the second element of lender liability. Actual fraud need not be established to satisfy this element; rather, it is sufficient to establish that control over the corporation was used "to perpetrate the violation of a ... positive legal duty or a dishonest or unjust act in contravention of plaintiff's legal rights." *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847, 853 (2d Cir.1985). *See also Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 138 (2d Cir.1991) ("Liability under [the instrumentality doctrine] may be predicated either upon a showing of fraud or upon complete control by the dominating corporation that leads to a wrong against third parties."); *Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.,* 909 F.2d 698, 703 (2d Cir.1990) ("New York allows the corporate veil to be pierced either when there is fraud or when the corporation has been used as an alter ego."); *Gartner v. Snyder,* 607 F.2d 582, 586 (2d Cir.1979). In this case, the Committee alleges that Austin and Schneider used their control over the Debtors to gain an unfair advantage and, as a result, injured the creditors of the Debtors. As discussed previously, the Committee alleges that Austin and Schneider breached their fiduciary duties to the unsecured creditors of the Operating Debtors by arranging the Austin Loans at a time when the Operating Debtors were undercapitalized. By causing the Austin Loans to be made, Austin and Schneider may have leveraged the Operating Debtors' assets to such an extent as to make it less likely that unsecured creditors would receive payment on their claims. In addition, if true, the facts indicate that through its relationship with Shalgi and Schneider, Austin gained equity control over the Operating Debtors without putting its capital at risk as an equity investment, thereby receiving an unfair advantage. Finally, the alleged preferential transfer of funds to RFD and Rokeach may establish that Schneider and/or Austin engaged in self dealing, a further breach of their fiduciary duties.

The Court also finds that, if the harm in fact occurred, it was proximately caused by "[t]he aforesaid control and breach of duty...." *Fisser,* 282 F.2d at 238. Accordingly, the Court finds that the Committee has alleged sufficient facts to establish the elements of a lender liability cause of action against both Austin and Schneider.

### (iii) In Pari Delicto Defense to Equitable Subordination and Lender Liability

Although the Court has found that the elements of each of the causes of action have been sufficiently alleged to maintain the actions against each of the Movants, the Court must consider the impact of the *in pari delicto* defense to the viability of those causes of action before determining whether the Committee has established that they are "colorable claims." The Court notes that the *in pari delicto* defense was raised as a separate ground for dismissal by the Movants in addition to the *STN* argument. However, since it is being considered in the context of the *STN* analysis herein, it will not be discussed again in this decision.

 The Movants contend that the Committee lacks standing to assert its causes of action against Austin and Schneider on behalf of the Debtors' estates because the Committee, standing in the shoes of the Debtors, is *in pari delicto* with Austin and Schneider. The defense of *in pari delicto* is short for *"in pari delicto potior est conditio defendentis,"* which means: "In the case of equal or mutual fault [between two parties] the con-

dition of the party ... [defending] is the better one." *Bateman Eichler, Hill Richards, Incorporated v. Berner,* 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985). *See also Goldin v. Primavera Familienstiftung, TAG Associates, Ltd. (In re Granite Partners L.P. II),* 194 B.R. 318, 327 n. 12 (Bankr.S.D.N.Y.1996). In essence, it "provides that wrongdoers ought each to bear out the consequences of their wrongdoing without legal recourse against each other." 1 Am.Jur.2d Actions § 46 (1994). "The doctrine is based on two premises: courts should not mediate between two wrongdoers, and denying judicial relief to a wrongdoer deters illegal conduct." *In re Granite Partners II,* 194 B.R. at 327.

The Movants argue that in the Committee's complaint, Shalgi, the sole shareholder of Holdings which, in turn, owns a controlling amount of the shares of the Operating Debtors, is included as one of the Controlling Parties along with Austin and Schneider. The Committee alleges throughout its complaint that the Controlling Parties engaged in the conduct that serves as the basis of the Committee's equitable subordination and lender liability claims. Therefore, the Movants conclude that because the Committee treats Shalgi as an equal partner in all of the alleged misconduct perpetrated by Austin and Schneider, and in that he is a principal of Holdings, as well as of the Operating Debtors, the *in pari delicto* doctrine applies and the Committee is barred from asserting either of its causes of action on behalf of the Debtors' estates.

■ In that the Committee has sufficiently alleged that Austin and Schneider dominated and controlled the Debtors in both its equitable subordination and lender liability claims, the *in pari delicto* defense is inapplicable regardless of whether the Committee is considered to be represent-

ing the interests of all the Debtors or only the Operating Debtors. "Where the parties do not stand on equal terms and one party controls the other, the in pari delicto doctrine does not apply." *See Kalb, Voorhis & Co. v. American Financial Corporation,* 8 F.3d 130, 132 (2d Cir.1993). *See generally Ross v. Bolton,* 904 F.2d 819, 824 (2d Cir.1990) ("Where both parties are in delicto [in fault], but not in pari delicto [in equal fault], a trial court should make findings regarding the respective amount of blame assigned to each, granting relief to the one whose wrong is less.") In that case, the Second Circuit found that "[t]he in pari delicto defense does not apply to [alter ego] actions because the essential element of such claims is that a controlling shareholder forced the corporation to act for the benefit of the shareholder through domination and control." *Kalb, Voorhis,* 8 F.3d at 132. In such cases, the element of mutual fault [*in pari delicto*] is not present, thereby rendering the defense unavailable. Accordingly, the Circuit found that "because [Kalb, Voorhis] alleges that AFC dominated and controlled Circle K, the in pari delicto doctrine would not bar Circle K from asserting an alter ego claim...." *Id.*

■ In addition, the *in pari delicto* doctrine is inapplicable where a cause of action is brought against an insider. *See In re Granite L.P. II,* 194 B.R. at 332 ("In pari delicto bars claims against third parties, but does not apply to corporate insiders or partners.") Although in that case the court was referring to officers and directors of the debtors, the situation in this case is effectively the same in that the Court has already found that the Committee has alleged sufficient facts to establish that Austin and Schneider are insiders of the Debtors. Therefore, the Committee has alleged sufficient facts with regard to Austin's and Schneider's insider status

through domination and control to render the *in pari delicto* defense inapplicable in this case.

### b. Benefit to the Reorganization Estates

■ The Second Circuit also requires that the Court to make a determination as to whether the causes of action asserted by the Committee are "likely to benefit the reorganization estate." *In re STN Enterprises*, 779 F.2d at 905. The court must consider: (1) "the probabilities of legal success and financial recovery in the event of success"; (2) make "a determination as to whether it would be preferable to appoint a trustee in lieu of the creditors' committee to bring suit (bearing in mind any fees imposed on the estate by such appointment, the wishes of the parties, and other relevant factors)"; and (3) "the terms relative to attorneys' fees on which suit might be brought." *Id.* Moreover, the "[f]ee arrangements should not only be made a matter off record but should be carefully examined by the court as it makes that determination." *Id.* The Court need not conduct a "mini-trial ... to determine [the] likelihood of success in such a suit or the attendant fees and expenses involved. But it should assure itself that there is a sufficient likelihood if success to justify the anticipated delay and expense to the bankruptcy estate that the initiation and continuation of litigation will likely produce." *Id.* at 906.

Based upon the facts as alleged and the Court's view of the controlling law on the issues raised, the Court finds that the Committee has demonstrated a likelihood of success on the claims raised. Moreover, success on any of the claims raised with respect to either of the Movants would provide a sufficient recovery, even considering reasonable attorneys that may be allowed for the Committee's counsel under

its retention order, to warrant the continuation of these actions at this time.

The Court also finds that it is preferable to have the Committee continue in litigating this proceeding. To date, none of the parties has sought the conversion of the case or the appointment a trustee. In any event, the conversion of the case or appointment of a chapter 7 or chapter 11 trustee to continue this litigation would not appear to provide any benefit to the estate at this time, and would likely cause unnecessary delay and costs in the resolution of this matter.

Therefore, based on the foregoing, the Court finds that the Committee has alleged sufficient facts to show that there would be a "likely benefit to the reorganization estate." *STN*, 779 F.2d at 905.

Accordingly, in that the Committee has established that it has standing to commence this adversary proceeding, the Movants' motions to dismiss, made pursuant to Fed.R.Civ.P. 12(b)(6), but considered under Fed.R.Civ.P. 12(b)(1), are denied.

### II. FED. R. CIV. P. 12(b)(6): FAILURE TO STATE A CLAIM

The Court has already considered the sufficiency of the Committee's causes of action under the motion to dismiss standard in the context of the *STN* analysis. In that section the Court found that the Committee has alleged sufficient facts that may establish the elements of its equitable subordination and lender liability claims. Hence, the Court will not repeat that analysis in consideration of Movant's motion to dismiss under Fed. R. Civ. P. 12(b)(6). Therefore, in accordance with that section of this opinion, the Court finds that the Committee has alleged sufficient facts which may establish the elements of each of the causes of action asserted against the Movants. Accordingly, the Movants' mo-

tions to dismiss for failure to state a claim are denied.

## III. CONCLUSION

The Court finds that, under the facts and circumstances of this proceeding, the *STN* standard may be applied retroactively. Moreover, having applied the *STN* standard, the Court finds that the Committee has satisfied it. The Court also finds that, under the facts alleged in this case, the *in pari delicto* defense does not bar the Committee from maintaining the causes of action asserted. With regard to Fed. R. Civ. P. 12(b)(6), the Court finds that the Committee has alleged sufficient facts which may establish the elements of each of the causes of action asserted against the Movants.

Accordingly, the Movants' motions to dismiss are denied.

The Committee is to settle an order consistent with this decision.